John DUDLEY, Plaintiff,

v.

AUGUSTA SCHOOL DEPARTMENT,
et.al., Defendants.

No. Civ. 98–65–B.

United States District Court,
D. Maine.

Nov. 9, 1998.

John P. Guase, Berman & Simmons, P.A., Lewiston, ME, for Plaintiff.

Melissa A. Hewey, Drummond, Woodsum, Plimpton & Macmahon, Portland, Maine, for defendants.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

In this civil rights action, Plaintiff John Dudley ("Plaintiff") alleges that Defendants Augusta School Department ("Department"), H. Graham Nye ("Nye"), and Maynard R. Young ("Young") demoted and constructively discharged him because of his disability and his whistleblowing activities. Plaintiff brings this action under the First Amendment to the Constitution of the United States (Count I), the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. § 831 *et seq.* (Count II), Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count III), and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.* (Count IV). Before the Court is Defendants' Motion for Summary Judgment on all Counts of Plaintiff's Amended Complaint. For the reasons stated below, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

### I. SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affadavits." Fed.R.Civ.P. 56(c). For the purposes of summary judgment the Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

### II. FACTS

Plaintiff was hired as an English teacher at Cony High School ("Cony") in 1976. In 1993, Principal Young and Superintendent Nye promoted Plaintiff to Administrative Assistant to the Principal, a position involving student supervision and discipline. From that point on, Plaintiff had both teaching and administrative duties.

On at least three occasions, Plaintiff voiced concerns to Young that a colleague ("Mr.A") had engaged in inappropriate phys-

ical relationships with female students at Cony. The first occasion was in 1993 or 1994. The second occasion was in the spring of 1995. At that time, two teachers expressed to Plaintiff their concerns that Mr. A was engaging in intimate activity with certain female students at Cony and asked if the administration was going to take action. Plaintiff alleges he spoke to Young in response to the teachers' comments, and Young told Plaintiff he was not going to initiate an inquiry until he had more substantial evidence. Soon after this conversation, Plaintiff telephoned the family of a female Cony graduate suspected of having had a relationship with Mr. A while she was a junior. When the family confirmed this suspicion, Plaintiff arranged a meeting between the woman's father and Young. Plaintiff spoke with Young after this meeting and understood Young to communicate that he would initiate an investigation. No investigation took place.

The third occasion was in the spring of 1996. Three teachers approached Plaintiff and stated their concerns that Mr. A continued to have inappropriate physical relationships with female students. On Saturday, March 23, 1996, one of these teachers came to Plaintiff's home and explained that she was concerned because a female student recently had left study hall to visit with Mr. A. Plaintiff called Young that same day and conveyed this colleague's concerns that no action had been taken with respect to Mr. A's alleged misconduct. Plaintiff asserts that Young's reaction to the issue was noncommittal, and that as a result, he did not believe Young planned to do anything. Plaintiff became quite angry during the phone conversation and told Young that if he did not take action, Plaintiff would. Plaintiff also asserts that during the spring of 1996, Young was pursuing a superintendent's position with another school district.

On Wednesday, March 27, 1996, Plaintiff met with District Attorney David Crook ("Crook") and an assistant district attorney and discussed the allegations against Mr. A. Plaintiff asserts that Crook told him it is illegal for teachers and administrators not to report this type of alleged abuse to the proper authorities.

On Friday, March 29, 1996, at 8:30 A.M., Plaintiff met with Lieutenant Buttrick ("Buttrick") and Detective Alan Johnson of the Augusta Police Department in Plaintiff's office at Cony. Plaintiff asserts that in order for the two police officers to locate Plaintiff's office in the school building that morning, they had to check with the front office located near the school entrance. Young's office is attached to this front office.

During this meeting, Plaintiff explained in detail the allegations against Mr. A. He also proffered a list of nine female students with whom Mr. A was suspected of having had intimate physical relationships. Buttrick asked Plaintiff to prepare a written statement and stated that the Augusta Police Department would investigate the matter.

That same day, Young called Nye and scheduled a meeting for Monday, April 1, 1996, in order to discuss problems with Plaintiff's performance and decide if he should continue with his administrative duties.

On Monday, April 1, Plaintiff decided to inform Young and Nye of the imminent police investigation. Before leaving for work, Plaintiff telephoned Nye and asked to meet with him and Young. Nye informed Plaintiff that he already was scheduled to meet with Plaintiff and Young at 1:00 P.M. that day. Plaintiff assumed that the meeting had been scheduled because of his heated March 23 telephone conversation with Young. When Plaintiff arrived at work later that morning, he found a memo on his desk from Young. The memo stated that Young and Nye wanted to meet with Plaintiff at 1:00 P.M. to discuss "some recent administrative issues around your A.P. work. You have the right to representation at this meeting." (Defs.['] Dep. Ex. 2.) Plaintiff again assumed that the meeting had been scheduled because of his earlier telephone conversation with Young and also thought it related to his persistence in pursuing the allegations against Mr. A. Plaintiff then invited Crook and Buttrick to attend the meeting so that they could convey to Young and Nye the importance of the investigation into Mr. A's alleged misconduct.

Plaintiff arrived at the meeting to find Young, Nye, Buttrick and Detective Jeff Pomerleau ("Pomerleau") present. Crook arrived a short while later. Young and Nye expressed surprise that the District Attorney and police officers were in attendance. They told Plaintiff that they had called the meeting with him to discuss his alleged mishandling of two student disciplinary matters. The group then discussed the allegations against Mr. A and it was determined that the Augusta Police Department would conduct an investigation into the matter.

After Crook, Buttrick, and Pomerleau left, Plaintiff met individually with Young and Nye. They questioned Plaintiff about the fact that he had written "Don't go whine to another administrator" on a student's discipline referral form and explained their intention to relieve Plaintiff of his position as Administrative Assistant to the Principal.[1] (Dudley Aff. ¶¶ 26, 31.)

Plaintiff told Young and Nye he was experiencing considerable stress and was being treated by a psychiatrist.[2] In addition to disclosing that he and his wife had separated the night before, Plaintiff explained that he had started taking a drug, Depakote, and that its levels in his bloodstream were being tested every three days. Plaintiff expressed hope that he would "level out" once his Depakote level was properly regulated. (Defs.['] Dep. Ex. 3.) The three agreed that Plaintiff would take a leave through the end of the April vacation and that they would meet again on April 16, 1996 to determine conclu-

sively the capacity in which Plaintiff would finish the school year.

The three reconvened on April 16, 1996, at which time Plaintiff was accompanied by Ron Colby, his attorney, and Jan Hastings, the deputy director for the Maine Teachers Association and Plaintiff's union representative. Plaintiff expressed his interest in maintaining his position as Administrative Assistant to the Principal and gave Young and Nye a letter from his psychiatrist indicating that he could return to work full-time, without any restrictions, as of April 22, 1996. The letter also stated that his psychiatrist was available to answer any questions they might have.

During the course of this meeting, Nye told Plaintiff he could return to Cony to perform his teaching responsibilities, but that he no longer could serve as Administrative Assistant to the Principal.[3] Plaintiff responded that if he could not continue in his administrative role, he would not return to Cony in any capacity. When Nye told Plaintiff that he would not change his mind, Plaintiff informed Nye of his resignation from his employment with the Department. He received a payment of what he characterizes as unpaid sick time up to $2500, a sum guaranteed under the terms of a contract between the Department and the Maine Teachers Association.[4]

### III. DISCUSSION

#### A. Constructive Discharge

As an initial matter, Defendants assert that there is insufficient evidence to support

---

1. Defendants also assert that Plaintiff inappropriately "baited" a student by calling him a "punk." Plaintiff counters that on March 27, 1996, he did ask a student "[w]hen are you going to stop being a punk," but only after that student told Plaintiff that he was not going to stay for detention, crumpled the detention notice over Plaintiff's head, and said "you know what you can do with this." (Dudley Aff. ¶ 29.) Plaintiff explains that he then suspended this student after the student loudly called Plaintiff a "dink" and held a clenched fist near Plaintiff's head in front of many other students. (Dudley Aff. ¶ 29.) Plaintiff further alleges that Young explicitly approved the student's suspension.

2. Plaintiff has consulted Charles Stewart, M.D., a psychiatrist, continuously from March 19, 1996 to the present. On March 19, 1996, Dr. Stewart diagnosed Plaintiff with bipolar disorder. Plain-

tiff did not disclose this diagnosis to Young and Nye during their April 1 meeting.

3. The parties dispute what was actually communicated regarding the terms of this proposed arrangement. Defendants claim Plaintiff was told that despite the change in his job responsibilities, the Department would maintain both his current salary and his reduced teaching load. Plaintiff claims that he was never told this, and that he thus assumed that he would be paid only for his teaching, which would constitute an $8500 salary reduction.

4. In contrast, Defendants characterize this money as "severance pay" which was negotiated by Plaintiff in exchange for his resignation and which was intended to resolve all future claims related to Plaintiff's employment with the Department.

a jury finding of constructive discharge, which is an element common to each of Plaintiff's claims. The Court disagrees.

 To demonstrate constructive discharge in the First Circuit, the evidence must support a finding that " 'the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 27 (1st Cir.1995) (quoting *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986)). This standard is an objective one and thus requires an inquiry into the "reasonable state of mind" of the person experiencing the new conditions. *See Greenberg*, 48 F.3d at 27. A claim of constructive discharge cannot stand on an unreasonable reaction to one's work environment or to a change in job responsibilities. *See id.; Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 26 (1st Cir.1997); *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 481 (1st Cir. 1993).

 The Court may consider several factors when assessing a constructive discharge claim: exposure to new conditions which are humiliating or demeaning; demotion or reduction in pay; and direct or circumstantial evidence of the employer's discriminatory animus. *See Hart v. University Sys. of New Hampshire*, 938 F.Supp. 104, 108 (D.N.H. 1996) (collecting cases). Other relevant considerations include: suggestions by the employer that the employee resign; confrontations initiated by the employer regarding the employee's alleged performance deficiencies; and the employee's attempts to mitigate the situation prior to resignation. *See id.* at 108–109.

Plaintiff contends he could not return to a classroom as a teacher after losing his administrative position because his students, many of whom had witnessed the alleged "baiting" incident, would mistakenly perceive that the administration had punished him for his role in controversial disciplinary matters. He believed this perception would compromise his authority in the classroom and would cause him to suffer humiliation. In support of this claim, Plaintiff offers the statement of Richard Hamilton, the Assistant Principal at Cony during the time in question:

> If [Plaintiff] had returned to Cony ... after his [administrative] position ... had been removed, his authority over the students at Cony would have been seriously compromised. He would have faced ridicule and scorn by the students. He also would have lost respect in the eyes of the faculty. It was well-known among the faculty and students at Cony that [Plaintiff's] position ... was a source of identity and self-esteem. Based on the totality of the circumstances, any reasonable person in [Plaintiff's] position would feel that he had no viable alternative but to resign.

(Hamilton Aff. ¶ 6.)

Defendants argue that, as a matter of law, Plaintiff's expectations that his authority over students would have been undermined and that he would not have commanded the same respect from his colleagues do not satisfy the objective standard applied in cases of constructive discharge.[5] In support of this proposition, Defendants cite a First Circuit case analyzing constructive discharge:

> [T]he law regards as the functional equivalent of a discharge those [circumstances which] will result in work so arduous or unappealing, or working conditions so intolerable, that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities.

*Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir.1993).

 Despite this passage's arguably more colorful language, the Court is convinced that this particular formulation is not substantively different from the traditional First Circuit standard reiterated in *Greenberg*, which requires evidence of "new working conditions [ ] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Greenberg*, 48 F.3d at 27. Furthermore, viewing the evi-

---

5. To the extent Defendants argue that Plaintiff is barred from claiming constructive discharge under the terms of a negotiated "settlement," the existence of a factual dispute as to the creation and terms of any settlement defeat this argument at the summary judgment stage.

dence in a light most favorable to Plaintiff, the Court finds several factors that could support a claim of discharge present in this case. Plaintiff has offered evidence that continuing to teach after his demotion would have subjected him to humiliation and compromised his effectiveness as a teacher and as a colleague. Moreover, there is a genuine issue of material fact as to whether Plaintiff believed his demotion was accompanied by a salary decrease. Finally, as will be discussed below, Plaintiff has produced some indirect evidence of discriminatory animus. Because Plaintiff has generated a triable question of fact on this issue, Defendant's Motion for Summary Judgment as to Plaintiff's claim of constructive discharge is denied.

### B. Retaliation

#### 1. First Amendment

■ Plaintiff asserts that Defendants violated his First Amendment rights by demoting and constructively discharging him for having engaged in constitutionally protected speech.[6] In order to survive Summary Judgment on this claim, Plaintiff must demonstrate that (i) he spoke on a matter of public concern and (ii) the protected speech was a substantial or motivating factor in the adverse employment action taken against him. *See Wytrwal v. Saco Sch. Bd.,* 70 F.3d 165, 170 (1st Cir.1995). If Plaintiff carries this burden, Defendants then have an opportunity to show "by a preponderance of the evidence that [they] would have reached the same decision ... even in the absence of the protected conduct." *Wytrwal,* 70 F.3d at 170 (citing *Mt. Healthy City Sch. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Defendants do not contest Plaintiff's claim that he engaged in constitutionally protected speech when he contacted District Attorney Crook and the police officers regarding the allegations against Mr. A. Rather, Defendants argue that Plaintiff has failed to present evidence that this speech was a substantial or motivating factor in the decision to relieve Plaintiff of his administrative duties. Defendants further argue that even if the

Court determines that such evidence exists, they have demonstrated by a preponderance of the evidence that they would have reached the same decision even if Plaintiff had not engaged in the protected expression. They claim that the evidence unequivocally indicates that they fully intended to relieve Plaintiff of his administrative position because of concerns about his judgment in disciplinary matters before ever learning of his contact with the authorities regarding the allegations against Mr. A. The Court disagrees.

The evidence reflects the following chronology of events: For several years, Plaintiff complained to Young that Mr. A was suspected of having sexual relationships with female students at Cony. Young never initiated an investigation into these allegations. During the spring of 1996, Young was pursuing a superintendent's position with another school district. On March 23, 1996, Plaintiff told Young that if he failed to take action regarding the allegations against Mr. A, Plaintiff would. On March 27, in the course of a disciplinary encounter, Plaintiff asked a student, "[w]hen are you going to stop being a punk?" In addition, sometime during the first half of March, Plaintiff issued the comment "Don't go whine to another administrator" on a student discipline referral form. On the morning of Friday, March 29, Plaintiff met with several police officers in his office at Cony to report the allegations against Mr. A. These officers had to present themselves at the front office, which is adjacent to Young's office, when they arrived to meet with Plaintiff. That same day, Young telephoned Nye to set up a meeting for April 1 to discuss problems with Plaintiff's performance and to decide if he should continue in his administrative role. On April 1, 1996, Plaintiff surprised Young and Nye by bringing the District Attorney and several police officers to their previously scheduled meeting. During this meeting, it was determined that the Augusta Police Department would conduct an investigation into the allegations against Mr. A. After the unexpected participants left, Young and Nye informed Plaintiff of their intention to relieve him of his admin-

---

**6.** This is the only claim to which Defendants Young and Nye are parties.

istrative position, citing his alleged mishandling of student disciplinary matters in March. This was the first time Plaintiff had been criticized for his role in these incidents. During Plaintiff's twenty years at Cony, the two incidents cited as the basis for this decision were the only two incidents of which Young and Nye were aware in which Plaintiff had allegedly acted inappropriately toward students. On April 16, 1996, Nye formally relieved Plaintiff of his administrative duties.

■ Viewing the evidence in a light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, the Court concludes that the evidence permits a reasonable inference that Defendants were substantially, if not solely, motivated by discriminatory animus, and not by a concern about Plaintiff's professional judgment, when they relieved him of his administrative position. A jury, and not this Court, must evaluate the factual questions relating to Young's state of mind when he scheduled the April 1 meeting with Nye and concerning the intent of the two administrators when they met with Plaintiff in April. The Court therefore denies Defendants' Motion for Summary Judgment as to this claim.

### 2. Maine Whistleblowers' Protection Act

■ Plaintiff alleges that he was discharged in violation of MHRA § 4572(1)(A) for having exercised his rights under the MWPA.[7] The analytical framework used in Title VII retaliation claims applies to MHRA retaliation claims. *See Nakai v. Wickes Lumber Co.*, 906 F.Supp. 698, 703 n. 5 (D.Me. 1995). Where there is no direct evidence of the defendant's retaliatory animus, courts rely on the *McDonnell Douglas* burden-shifting framework to allocate and order the parties' evidentiary burdens. *See Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996); *Mesnick v. General Electric Co.*, 950 F.2d 816, 827 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). To establish a prima

facie case of retaliation, the plaintiff must show that: (1) he engaged in conduct protected by the MWPA; (2) he suffered adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action. *See Fennell*, 83 F.3d at 535; *Hoeppner v. Crotched Mountain Rehabilitation Ctr., Inc.*, 31 F.3d 9, 14 (1st Cir.1994).

■ Once the plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision. *See Fennell*, 83 F.3d at 535. If the defendant does so, the ultimate burden falls on the plaintiff to demonstrate both that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus. *See id.*

Plaintiff cites Section 833(1)(A) as the basis for his whistleblowing claim. This provision prohibits an employer from discriminating against an employee because

> "[t]he employee, acting in good faith ... reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States."

26 M.R.S.A. § 833(1)(A).

The Department claims that Plaintiff has failed to satisfy the first element of the prima facie case because he reported what he believed to be unlawful conduct of a *colleague*, and the Maine Law Court has stated that the MWPA Section 833(1)(A) "requires an employee to prove that a reasonable person might have believed that the *employer* was acting unlawfully." *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 155 (Me.1991) (emphasis added). Plaintiff responds that, at least in some circumstances, the MWPA does protect employees who report illegal conduct committed by persons other than their employers.[8] He directs the Court to 22 M.R.S.A. § 4011(1)(D), which provides that:

---

**7.** On January 5, 1998, the Maine Human Rights Commission determined that there were reasonable grounds to believe that the Department had retaliated against Plaintiff on the basis of his whistleblowing activities when it relieved him of his administrative duties.

**8.** In light of its determination as to this issue, the Court does not address Plaintiff's two alternative

When, while acting in a professional capacity, [a teacher or school official] knows or has reasonable cause to suspect that a child has been abused or neglected by a person not responsible for the child, the person shall immediately report or cause a report to be made to the appropriate district attorney's office.

22 M.R.S.A. § 4011(1)(D).

The Court observes that, in fact, the MWPA references this very provision and states that:

An employee required to report suspected abuse, neglect or exploitation under *Title 22, section 3477 or 4011,* shall follow the requirement of those sections under those circumstances. No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment *because the employee followed the requirements of those sections.*

26 M.R.S.A. § 833(3) (emphasis added).

Thus, the Court is satisfied that the MWPA covers Plaintiff's conduct, but treats Plaintiff's claim as grounded in Section 833(3).

■■■ In addition to demonstrating that he engaged in conduct protected by the MWPA, Plaintiff has also established the other two elements of a prima facie case of retaliation. First, Plaintiff was subject to an adverse employment action when he was relieved of his position as Administrative Assistant to the Principal. Second, Plaintiff has presented evidence of a causal connection between his reporting of alleged illegality and the adverse action taken against him. Evidence that an employee experienced adverse employment action soon after making a complaint may support an inference of causal connection. *See Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 168 (1st Cir. 1998); *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 110 (1st Cir.1988); *Nelson v. University of Maine Sys.,* 923 F.Supp. 275, 285 (D.Me.1996). Here, the evidence indicates

that Nye and Young learned of Plaintiff's protected conduct at least as early as 1:00 P.M. on April 1, and they announced their intention to demote him later that same day, finalizing the decision on April 16.

■■■ The Department has articulated a legitimate, nondiscriminatory reason for its decision regarding Plaintiff's employment: its belief that Plaintiff no longer was exercising appropriate judgment in his role as a student disciplinarian. The Court is persuaded, however, that the facts outlined in its analysis of Plaintiff's First Amendment claim, raise sufficient questions of pretext to warrant a denial of the Department's Motion for Summary Judgment on this claim.

### C. Disability Discrimination

Plaintiff alleges that the Department constructively discharged him, in part, because of his disability, bipolar disorder. Plaintiff's ADA and MHRA claims are subject to identical legal analysis. *See Abbott v. Braydon,* 107 F.3d 934, 938 (1st Cir.1997) ("The Maine Supreme Court has indicated that analogous federal law informs the interpretation of the MHRA.") (citing *Bowen v. Department of Human Services,* 606 A.2d 1051, 1053 (Me. 1992)).

■■■ To establish a prima facie case of disability discrimination under the ADA, the plaintiff must demonstrate that (i) he was disabled within the meaning of the Act; (ii) with or without reasonable accommodation he was able to perform the essential functions of the job; and (iii) his employer acted adversely to him in whole or in part because of his disability. *See Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 511 (1st Cir.1996).

■■■ Where the plaintiff cannot satisfy this burden with direct evidence, the burden shifting rules established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802– 05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), are applied. *See Jacques,* 96 F.3d at 511. Un-

---

arguments. First, he contends that the plain language of Section 833(1)(A) indicates that the violation about which an employee complains can be committed by anyone. Second, he argues that his conduct is covered by Section 833(1)(A)

because the statute defines "employer" to include "agent[s] of the employer," *see* 26 M.R.S.A. § 832(2), and Mr. A was an agent of the Department.

der this indirect evidence scheme, a plaintiff must demonstrate that: (i) he has a disability within the meaning of the Act; (ii) he is qualified to perform the essential functions of the job, with or without reasonable accommodation; (iii) he was subject to an adverse employment action by an employer subject to the Act; (iv) he was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) he suffered damages as a result. *See Jacques*, 96 F.3d at 511.

Plaintiff contends that he need not satisfy the *McDonnell Douglas* elements applicable to cases of indirect evidence because he has produced direct evidence of disability discrimination. The Department challenges his characterization of the cited evidence as "direct." The evidence proffered by Plaintiff is a statement made by Nye during his deposition:

> Q. [Did your decision to relieve Plaintiff of his administrative position take] into account at all [Plaintiff's] mental health?
>
> A. That was certainly a consideration on my part, that I was concerned that— that John would react to stress if there were certainly (sic) marital problems and—which he had expressed to us. I knew nothing of any other mental problems. There was no medical documentation that had been presented.

(Nye Dep. at 24.)

▉ The Court is satisfied that this statement, which specifically references a concern about Plaintiff's marital difficulties, is not sufficient to qualify as "direct evidence" of discriminatory intent. In *Nedder v. Rivier College*, 944 F.Supp. 111 (D.N.H.1996), the Court commented that direct evidence of discrimination is "that evidence which, if believed, 'establishes discriminatory intent or motive without inference or presumption.'" *Nedder*, 944 F.Supp. at 114 n. 3 (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir.1993)). "Only the most blatant remarks whose intent could only be to

discriminate constitute direct evidence." *Id.* Here, Nye's acknowledgment that he considered Plaintiff's "mental health," when read in context, does not constitute "direct evidence" of discrimination. In order to discern discriminatory intent in the statement, the Court must draw the substantial inference that Nye actually was referring to Plaintiff's bipolar disorder and not to Plaintiff's marital problems. This inferential leap is the mark of indirect, not direct, evidence.

▉ Thus, Plaintiff must produce evidence sufficient to satisfy each of the five *McDonnell Douglas* elements outlined above. The Department does not challenge Plaintiff's assertion that bipolar disorder constitutes a "disability" under the ADA. Instead, it argues that Plaintiff cannot make out a prima facie case of disability discrimination because he has failed to offer evidence of disparate treatment which would indicate the presence of discriminatory animus.[9] Plaintiff presented no evidence indicating that similarly situated non-disabled employees at Cony were treated differently than him. Therefore, he has failed to make out a prima facie case of disability discrimination and the Court grants the Department's Motion for Summary Judgment as to Plaintiff's ADA and MHRA discrimination claims.

### IV. CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment on all Counts of Plaintiff's Complaint is GRANTED as to Plaintiff's disability discrimination claims (Counts III and IV) and DENIED as to Plaintiff's constructive discharge, First Amendment, and whistleblowing claims (Count I and II).

*SO ORDERED.*

---

9. The Department also argues that Plaintiff cannot demonstrate that he is a "qualified individual with a disability."