STATE OF MAINE
CUMBERLAND, ss.

STATE OF MAINE
CUMBERLAND, SS.
CLERK'S OFFICE

Feb 23   4 10 PM '01

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. 99-613

REC-CUM — 2/28/2001

KAREN M. LERMAN,

Plaintiff

v.

DECISION AND ORDER

MT. SINAI CEMETERY
ASSOCIATION, INC. and
ROBERT HARRISBURG,

Defendants

## FACTUAL BACKGROUND

Defendant Robert Harrisburg was a volunteer president and director for the Defendant Mt. Sinai Cemetery Association, a non-profit, charitable organization. Plaintiff's Statement of Material Facts ("PSMF") ¶ 1. Plaintiff Karen Lerman, the Mt. Sinai Administrative Director, was one of two employees from June, 1997 until she quit on December 30, 1997. Defendants' Statement of Material Facts ("DSMF") ¶ 2. Lerman reported directly to Harrisburg, her supervisor. PSMF ¶ 4. During Lerman's employment, Mt. Sinai had no sexual harassment policy, no specific procedures for dealing with sexual harassment, no seminars concerning sexual harassment or sex discrimination, no notices posted concerning sexual harassment during Lerman's employment, and no notice posted as required under the Workers' Compensation Act. Id. ¶¶ 42-45.

The plaintiff alleges that Harrisburg created a hostile work environment based on the following incidents of alleged sexual harassment:

1. During the first or second week of her employment, when the office furniture and equipment was being rearranged, Harrisburg told Lerman to move the direction of her desk so that "nobody will be looking at your tits." Id. ¶ 5. After Lerman responded "I can't believe you're saying that to me," and told him not to say that to her, he looked at her and laughed. Id. ¶ 6.

2. Harrisburg inquired about Lerman's relationship with Rabbi Frisch. When Lerman told him that Frisch was a friend, he responded, "You're working for an orthodox cemetery. I need to know if something went on between the two of you so I can defend your honor." Id. ¶¶ 7-8. Lerman claims she was extremely hurt and that Harrisburg used an accusatory tone. Id. ¶ 9. Harrisburg told her not to ever tell anyone of the conversation. Id. On another occasion, he asked her if she had heard from her "friend, Rabbi Frisch," with emphasis on "friend." Id. ¶ 10. Lerman did not answer the question. Id.

3. Immediately after the second incident, Harrisburg asked Lerman if she knew Sam Cohn. Id. ¶ 11. When she answered yes and that he was very nice, Harrisburg said, "He's nothing but a whore master." Id. Although Harrisburg repeated the epithet several more times, the conversation ceased upon Lerman's request. Id. ¶ 12; DSMF ¶ 10.

4. In August, 1997, after a fund-raising meeting, Harrisburg asked Lerman what was going on between her and Jim Baker. PSMF ¶ 13. Lerman responded that she didn't know what he was talking about and that nothing was between her and Jim Baker. Id. Harrisburg then said, "I'm just making sure there is nothing going

on between the two of you. I'm just checking. I have to check these things." Id. When Lerman expressed her indignation, Harrisburg said, "I have to make sure that everything is fine. We're a religious organization." Id. ¶ 14. On several later occasions, Harrisburg asked Lerman if she had a relationship with Jim Baker. Id. ¶ 15. She found this offensive. Id.

5. In late summer, 1997, Lerman walked into her office and found Harrisburg sitting there. Id. ¶ 16; DSMF ¶ 12. He immediately told her she had "nice legs." PSMF ¶ 16. She responded by telling him that she thought her legs were too thin. DSMF ¶ 12. His comment made her uncomfortable. PSMF ¶ 16.

6. On another occasion when Lerman walked into her office, Harrisburg said, "You look nice, look at those legs. I know now why you were hired, you were hired because of your legs." Id. ¶ 17. He laughed when she responded that the reason she was hired had nothing to do with her appearance but was to give Mt. Sinai's fundraising campaign credibility. Id. ¶ 18.

7. When Lerman and Harrisburg were both preparing to go to a meeting to inform the Temple Beth El and the leadership about the fund-raising campaign of the Mt. Sinai Association he said, "Don't wear anything short. We don't want them staring at your legs. We want them listening to me." Id. ¶ 19; DSMF ¶ 14. Lerman was offended and responded that he didn't have to tell her how to dress. PSMF ¶ 19. Despite her protestations, Harrisburg made ongoing comments about Lerman's legs. Id. ¶ 20.

8. In early September, 1997, at a meeting between Harrisburg, Lerman and

three others, Harrisburg told two off-color jokes. Id. ¶ 21; DSMF ¶ 15. The first involved "an old bitch in a wheelchair being thrown out of a plane." PSMF ¶ 21. Lerman does not recall any more of the content of the jokes other than they were both "off color." Id. Lerman was not amused, and Selma Black, another woman at the meeting, was offended. Id. ¶¶ 21-22.

9. After a parlor meeting hosted by Selma Black from which Harrisburg was excluded, Harrisburg called Lerman and asked her if she received any money. Id. ¶ 23. She responded, "Not yet, but I'm sure we're going to get some contributions. It looks good." Id. Harrisburg then said, "You're a whore, do you know that?" Id. Lerman told him not to call her that and said, "You have no right to say that to me." Id. ¶ 24. Harrisburg responded, "I'll call you anything I want. You're a whore. You're nothing but a whore. And do you know why you're a whore? Because whores do things for money and get things in return, and you're nothing but a whore." Id. Harrisburg also called Lerman a whore on later occasions. Id. ¶ 25.

According to Lerman, Harrisburg was angry because the Board of Directors gave approval to go ahead with a fund-raiser which the president had not been asked to attend. DSMF ¶ 16. Harrisburg later referred to the Board collectively as a "bunch of whores" for excluding him. Id. According to Rhea Attias, a professional fund-raiser hired by Mt. Sinai, Harrisburg referred to both Lerman and her as "whores." Id.; Attias Aff. ¶ 9. Attias believed the term was used to refer to people of both genders who were unprincipled. DSMF ¶ 16.

10. In late October, 1997, it was proposed at a Board meeting to ask Maury

4

Povich to act as a spokesperson for Mt. Sinai. PSMF ¶ 26. Lerman then suggested including his wife, Connie Chung. Id. With regard to Connie Chung, Harrisburg said, "She's not even Jewish. The only Jewish thing in her is Maury Povich's dick." Id. Lerman told him that his statement was disgusting. Id. Harrisburg then laughed at his own joke and said, "Yes. But it's true." DSMF ¶ 17. Harrisburg routinely used vulgarity in Lerman's presence although she asked him to stop. PSMF ¶ 27. Sometimes he used vulgarity in the presence of both men and women. DSMF ¶ 21.

11. On November 5, 1997, when Lerman and Harrisburg were in the office together, Harrisburg started tickling his arm and stated that "it reminds me of drinking my mother's milk." PSMF ¶ 28. Lerman replied, "That's disgusting." Id. ¶ 29.

12. On November 6, 1997, after receiving a certified letter from an attorney charging that a woman had been buried in the wrong place facing the wrong way on top of a male, Harrisburg said to Lerman that "she probably enjoys being the one on top of the guy this time." Id. ¶ 30. Lerman responded that "this is terribly disgusting that you would say something like this, especially because we're a cemetery organization and this is somebody who's passed away." DSMF ¶ 18.

13. After a meeting with Rabbi Carolyn Braun, Harrisburg told Lerman that the Rabbi had a dog for a pet because she was single and that the dog would "satisfy" her. PSMF ¶ 31. Lerman was extremely upset by this. Id.

Harrisburg also threatened Lerman several times. Id. ¶ 32. During the phone

call in which he called her a whore, he warned that he knew how to "get even with all the whores." Id. The next day he reiterated that he had "ways of getting even with people." Id. On another occasion he told Lerman that "I have thugs who work for me, and they know what to do." Id.

During the week of November 17, 1997, Lerman called Harrisburg into her office and told him that she wanted to be treated like a lady and that she was sick of his vulgarities. Id. ¶ 33. He left her office without offering to change his behavior. Id. He then telephoned her, screaming "I'll do what I want and I'll say what I want and you can't stop me." Id. He used no vulgarity in the conversation other than "goddamn it." DSMF ¶ 23.

That same week, Lerman reported the incidents of sexual harassment to Mt. Sinai's counsel Bruce Sleeper and treasurer, James Baker. PSMF ¶ 34. This was the first notification the Association had received that Lerman perceived Harrisburg's conduct to be sexual harassment. DSMF ¶ 24. After the representatives of Mt. Sinai's Board met with Harrisburg, he telephoned Lerman yelling and screaming at her. PSMF ¶ 35. When she told him she did not want to be yelled at he said, "I will yell at you if I want to!" Id. He then said, "Oh, you don't like to be talked to like this, do you? I'll do what I want." Id.

At 3:00 p.m. that Friday (November 21, 1997), before a fund-raising function at the Marriott on Sunday, November 23, 1997, Lerman received a list of additional

6

work that needed to be done immediately by fax from Rhea Attias.[1] Id. ¶ 36; DSMF ¶ 22. She was required to re-do eleven fund-raising packets and organize all the seating plans for the Sunday function. PSMF ¶ 36. It took her eleven hours to do the extra work. Id. Lerman received a hostile and abrupt phone call from Harrisburg on Saturday, November 22, 1997 at 10:00 a.m. Id. ¶ 37. This hostile behavior continued until the next day at the fund-raising meeting. Id. Lerman was distressed and frightened. PSMF ¶ 37.

After Lerman complained to Sleeper and Baker during the week of November 17, 1997, they had a conversation with Harrisburg about her complaints. Id. ¶ 40. Harrisburg admitted some of the allegations during this conversation. Id. After the complaint was raised, Harrisburg was immediately instructed by the Board to have no contact with Lerman pending its investigation. DSMF ¶ 25. After the November 23, 1997 fund-raiser, Ms. Lerman did not see or speak to Mr. Harrisburg again. Id. ¶ 32.

Within a month, the Board met to discuss Ms. Lerman's allegations, indicating to her attorney that they took the allegations seriously and had instructed Harrisburg to stop making such comments to or in the presence of Ms. Lerman or any employee of Mt. Sinai. Id. ¶ 26. The Mt. Sinai Board allowed Harrisburg to remain President of the organization and the person in charge of Lerman's office.

---

1 Although Lerman claims in her statement of material facts that Harrisburg assigned the additional work, the deposition transcript referred to by her 7(d) statement reveals that the fax was from Rhea Attias, the fund-raising consultant hired by Mt. Sinai. See PSMF ¶ 36; DSMF ¶ 22; Lerman Tr. at 140.

PSMF ¶ 39. By unanimous vote of the Board, however, Harrisburg was directed to no longer make statements of a sexual nature or content to, or in the presence of, Ms. Lerman. DSMF ¶ 27. The letter also stated that "it is the Board's intent that any failure by Mr. Harrisburg to so comply will result in a speedy dismissal as President of the Association and will be grounds for his removal as a Board member as well." Id.

Ms. Lerman claims that she was compelled to tender her resignation on December 29, 1997 because she was physically in fear of Harrisburg. PSMF ¶ 39. The Plaintiff then filed a three-count complaint against Mt. Sinai and Robert Harrisburg, alleging a violation of the Maine Human Rights Act ("MHRA") (Count I), Intentional Infliction of Emotional Distress ("IIED") (Count II) and Negligent Infliction of Emotional Distress ("NIED") (Count III) on October 25, 1999.

DISCUSSION

## I. Maine Human Rights Act

The Maine Human Rights Act provides that an employer may not discriminate against an employee on the basis of sex "with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment." 5 M.R.S.A. § 4572(1)(A) (West 1989 & Pamph. 2000). The use of Title VII case law is appropriate as an aid in interpreting this anti-discrimination provision of the Maine Human Rights Act. Bowen v. Department of Human Services, 606 A.2d 1051, 1053 (Me. 1992). Although sexual harassment is not expressly proscribed by Title VII and the

MHRA, courts have construed the statutes to prohibit it. See Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Nadeau v. Rainbow Rugs, Inc., 675 A.2d 973 (Me. 1996).

### A. Hostile Work Environment

A plaintiff may base her sexual harassment claim on one of two theories: quid pro quo harassment or hostile work environment. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). Quid pro quo harassment cases are based on threats that are carried out. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751 (1998). Hostile work environment cases are based on sexual harassment that is "sufficiently severe or pervasive" as to " 'alter the conditions of [the victim's] employment and create an abusive working environment.' " Meritor, 477 U.S. at 67 (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982)).

> To succeed in a hostile work environment claim, Ms. Lerman must establish
>
> (1) that she ... is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

O'Rourke v. City of Providence, Nos. 99-2346, 00-1008, 2001 WL 8598, at *13 (1st Cir. Jan. 8, 2001) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-789 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-23 (1993); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-73 (1986)).

9

The Plaintiff has established that she was subjected to unwelcome sexual harassment. In response to Harrisburg's comment about her breasts, the Plaintiff told him not to say that to her. The Plaintiff told Harrisburg to stop the conversation when he continually repeated that Sam Cohn was a "whore master." She found the comments about her legs to be offensive and she protested. The Plaintiff told Harrisburg not to call her a whore. She repeatedly asked him to stop using vulgarity in her presence. She told him she found his comment about "drinking [his] mother's milk" to be disgusting. All of this indicates that Ms. Lerman was subjected to *"unwelcome* sexual harassment."

To be actionable, the harassment must be based upon sex; that is, the conduct must have been directed at her or occurred in the Plaintiff's presence because she was a woman. See Bowen, 606 A.2d at 1053-54. To survive a motion for summary judgment, therefore, the Plaintiff must generate a factual issue that would support an inference that the incidents would not have occurred but for her gender. See id. at 1053. The Defendants point to two incidents to support their argument that Harrisburg's conduct was not based on the Plaintiff's gender: (1) the off-color jokes were told to members of both genders; (2) "whore" was used to refer to members of both genders. Numerous other incidents exist, however, that would support a contrary finding such as telling Lerman to move the direction of her desk so that no one would be looking at her "tits," the comments that she had "nice legs" and that she was hired because of her legs, and telling Lerman before a fundraising event, "Don't wear anything short. We don't want them staring at your legs. We want

10

them listening to me."

Actionable sexual harassment must be both objectively and subjectively offensive, creating an environment that "a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787. To determine whether an environment is sufficiently hostile or abusive, courts must look at the totality of the circumstances, including the frequency of the discriminatory conduct,[2] its severity, whether it is physically threatening or humiliating or is instead merely an offensive utterance, and whether it unreasonably interferes with the employee's work performance. Id. at 787-88. The Plaintiff's psychological well-being is also relevant to determining whether she found the environment abusive. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). However, no single factor is determinative. Id.

The Plaintiff has clearly created an issue of fact as to the severity and pervasiveness of the sexual harassment. She has alleged a pattern of conduct that occurred over a six-month period. The conduct involved, among other things, off-color jokes, questioning the Plaintiff about her relationships, commenting on the

---

[2] While many cases involve a pattern of harassment,

> [T]here is no requirement that harassment occur more than one time in order to be actionable. The standard contemplates conduct that is either severe or pervasive. Although the conduct may be both, only one of the qualities must be proved in order to prevail. The severity of the conduct may vary inversely with its pervasiveness. Whether the conduct is so severe as to cause the environment to become hostile or abusive can be determined only by considering all the circumstances, and this determination is left to the trier of fact.

Nadeau v. Rainbow Rugs, Inc., 675 A.2d 973, 976 (Me. 1996) (finding that a single instance of sexual harassment was sufficiently severe to create a hostile work environment).

11

physical appearance of the Plaintiff and using vulgar language. While the Defendants have attempted to explain away each incident alleged by the Plaintiff, to accept those explanations would be to inappropriately draw inferences in favor of the Defendants.

B. "Corrective Action" Defense

An employer is subject to vicarious liability for the hostile environment created by a supervisor with immediate or successively higher authority over the employee. Faragher, 524 U.S. at 807. If the harassment does not result in a tangible employment action, the employer may raise the affirmative defense "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and ... that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

Significant changes in employment status, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a change in benefits" are tangible employment actions. Ellerth, 524 U.S. at 761.

> Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. The supervisor often must obtain the imprimatur of the enterprise and use its internal processes.

Id. (citations omitted).

There is no clear consensus among the courts as to whether constructive discharge may amount to a tangible employment decision. See, e.g., Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 294-95 (2d Cir. 1999) (holding constructive discharge is not a tangible employment action); Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 n.5 (3d Cir. 1999) (holding constructive discharge is a tangible employment action); Phillips v. Taco Bell Corp., 156 F.3d 884, 889 n.6 (8th Cir. 1998) (implying constructive discharge may possibly be a tangible employment action but finding no constructive discharge occurred). Whether constructive discharge amounts to a tangible employment action so as to bar the affirmative defense or not, however, on the undisputed facts and as a matter of law, Ms. Lerman was not constructively discharged.

To establish a claim of constructive discharge, "the evidence must support a finding that the 'new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " Greenberg v. Union Camp Corp., 48 F.3d 22, 27 (1st Cir. 1995) (quoting Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986)). See also Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993) (new conditions must make work so "arduous," "unappealing" or "intolerable" that a reasonable person would resign). The use of the word "new" implies that courts should narrow the focus to the events leading up to the plaintiff's resignation. See Hart v. University Sys. of New Hampshire, 938 F.Supp. 104, 106-07 (D.N.H. 1996) (focusing on the changed conditions that led up to the plaintiff's departure).

13

Courts must apply an objective standard when analyzing the evidence, focusing the inquiry on the reasonable state of mind of the person experiencing the new conditions. Dudley v. Augusta School Dep't, 23 F.Supp.2d 85, 90 (D. Me. 1998). An employee may therefore not be unreasonably sensitive to her working environment. Id. Factors to consider when assessing a constructive discharge claim include "exposure to new conditions which are humiliating or demeaning; demotion or reduction in pay; and direct or circumstantial evidence of the employer's discriminatory animus." Id. A court should also consider an employer's suggestion that the employee resign and the employee's attempts to mitigate the situation prior to her resignation. Id. See also Hart, 938 F.Supp. at 108.

After the November 23, 1997 fund-raiser, Ms. Lerman had no contact, verbal or physical, with Mr. Harrisburg. She was not exposed to new humiliating or demeaning conditions, her pay was not reduced as a result of reporting Mr. Harrisburg's harassing behavior to the Board, there is no evidence of any discriminatory animus on the part of the Board, and there was no suggestion that she should resign from her position. Because the working conditions prior to Ms. Lerman's resignation were actually an improvement from the prior conditions, a reasonable factfinder could not find the conditions so intolerable that a reasonable person would have been compelled to resign. Accordingly, no tangible employment action was taken by the Defendants so as to preclude the affirmative defense.

The Plaintiff next argues that the affirmative defense does not apply where the harassment has been perpetrated at the highest levels of management.

14

Therefore, she contends, an employer is absolutely liable for actionable harassment committed by its president. In <u>Faragher</u>, the Supreme Court specifically held that the only situation in which the affirmative defense is unavailable to an employer is when the supervisor's harassment results in a tangible employment action. <u>Faragher</u>, 524 U.S. at 808; <u>see</u> <u>also</u> <u>Ellerth</u>, 524 U.S. at 765. While the Court did note that the president of a corporate employer was "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy," this statement was made in the context of discussing the variety of reasons invoked by courts of appeals to hold an employer liable for the harassing acts of its supervisors. <u>See</u> <u>Faragher</u>, 524 U.S. at 789-91. The <u>Faragher</u> Court does not hold that the affirmative defense is inapplicable after finding that a supervisor's actions may be imputed to the employer. <u>See</u> <u>id</u>. at 789. In fact, the Court expressly states that it could not recognize vicarious liability under Title VII unless the theory could be squared with the holding in <u>Meritor</u> that an employer is not "automatically" liable for a supervisor's harassment. <u>See</u> <u>id</u>. at 804; <u>Meritor</u>, 477 U.S. at 73.

An issue of fact exists as to whether Mt. Sinai exercised reasonable care to prevent and correct promptly any sexually harassing behavior, the first prong of the affirmative defense.[3] Mt. Sinai had no written sexual harassment policy or complaint procedure in place at the time of the Plaintiff's employment. However, proof that an employer promulgated a sexual harassment policy is not required as a

---

[3] The other prong of the affirmative defense is that the plaintiff failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm. <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998).

matter of law. <u>Faragher</u>, 524 U.S. at 807 ("[T]he need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."). A sexual harassment policy may not be necessary for an "employer of a small workforce, who might expect that sufficient care to prevent tortious behavior could be exercised informally." <u>Id</u>. at 808. Further, after the acts complained of, Ms. Lerman did utilize some process within the Association to complain to Bruce Sleeper, Mt. Sinai's legal counsel. This complaint then found its way to the Mt. Sinai Board.

## C. Retaliation

The Plaintiff alleges that after she complained to the Board of Directors, Harrisburg retaliated against her by intimidating her, shouting at her and punitively forcing her to do extra work on the weekend. Although it is unclear from the Plaintiff's brief whether she is asserting an independent retaliation claim under the MHRA or whether the alleged retaliatory actions are relevant to the corrective action defense, the undisputed facts do not support either theory.

According to § 4572 of the Maine Human Rights Act, it is unlawful for an employer to "discriminate in any manner against individuals because they have opposed a practice that would be a violation of this Act or because they have made a charge ... under this Act." 5 M.R.S.A. § 4572(1)(E) (West Pamph. 2000). To establish a prima facie case of retaliation, the Plaintiff must show that (1) she engaged in conduct protected by the Act; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action.

16

See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 57 (1st Cir. 2000); DiCentes v. Michaud, 1998 ME 227, ¶ 14, 719 A.2d 509, 514.

The plaintiff has established that she engaged in protected activity under the MHRA, the first requirement to establish a retaliation claim. However, on the undisputed facts, she has failed to establish that she suffered an adverse employment action as a result of that protected conduct. Neither the alleged shouting and intimidation by Harrisburg nor the list of additional work given to the Plaintiff by Rhea Attias rises to the level of an adverse employment action. See, e.g., Dudley, 23 F.Supp.2d at 93 (relieving high school teacher of his duties as Administrative Assistant to the Principal); Higgins v. New Balance Athletic Shoe, Inc., 21 F.Supp.2d 66, 73 (D. Me. 1998) (plaintiff was discharged from his position as a production team member at the defendant's shoe manufacturing plant); DiCentes, 1998 ME 227, ¶ 15, 719 A.2d at 514 (high school teacher's contract was not renewed). The alleged retaliatory actions also do not rise to the level of a tangible employment action so as to deprive the Defendants of the corrective action defense. See Ellerth, 524 U.S. at 761 (holding that a tangible employment action is a significant change in employment status such as hiring, firing, or failing to promote).

**D. Supervisor Liability**

The MHRA prohibits employers from discriminating on the basis of sex. 5 M.R.S.A. § 4572(1)(A). The term "employer" includes "any person in this State employing any number of employees" as well as "any person acting in the interest

17

of any employer, directly or indirectly." 5 M.R.S.A. § 4553(4) (West Pamph. 2000).[4]

Although the MHRA is silent as to whether individuals are subject to personal liability, the United States District Court for the District of Maine has construed the Act not to subject individual supervisors to suit. See Quiron v. L.N. Violette Co. Inc., 897 F.Supp. 18, 21 (D. Me. 1995). "[T]he inclusion in the MHRA of persons acting in the interest of any employer, merely ensures that respondeat superior liability can be imposed upon Maine employers for the actions of their agents." Id. The determination that supervisors may not be sued in their individual capacity under both the federal employment discrimination statutes and the MHRA is consistent with the legislature's apparent desire to protect small businesses.[5] Because Harrisburg is not subject to suit under the MHRA for his alleged discriminatory acts, summary judgment must be granted in his favor on Count I.

### E. Compensatory and Punitive Damages

The MHRA does not permit the award of certain compensatory[6] and punitive

---

[4] Similarly, the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA") definitions of "employer" also include agents of the employer. See 42 U.S.C.A. § 12111(5)(A) (West 1995); 29 U.S.C.S. § 630(b) (Law. Co-op. 1990).

[5] The ADEA applies only to businesses with twenty or more employees. 29 U.S.C.S. § 630(b). The ADA and Title VII apply only to businesses with fifteen or more employees. See 42 U.S.C.A. § 12111(5)(A); 42 U.S.C.S. § 2000e(b) (Law. Co-op. 1989). The MHRA does not permit the award of compensatory and punitive damages against an employer with fewer than 15 employees. 5 M.R.S.A. § 4613(2)(B)(8)(e) (West Pamph. 2000). The Ninth Circuit noted that these limits on the federal employment discrimination statutes were included "in part because Congress did not want to burden small entities with the costs associated with litigating discrimination claims. Miller v. Maxwell's Int'l Inc., 991 F.2d 583, 587 (9th Cir. 1993); see also Quiron v. Violette Co. Inc., 897 F.Supp. 18, 20 (D. Me. 1995).

[6] Under the MHRA, compensatory damages do not include back pay or interest on back pay. 5 M.R.S.A. § (2)(B)(8)(d).

18

damages against defendants with fewer than 15 employees. Section 4613(2)(B)(8)(e)

of the MHRA provides

> The sum of compensatory damages awarded under this subparagraph for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, other nonpecuniary losses and the amount of punitive damages awarded under this section may not exceed for each complaining party:
> (i)  In the case of a respondent who has more than 14 and fewer than 101 employees ...
> (ii)  In the case of a respondent who has more than 100 and fewer than 210 employees ...
> (iii)  In the case of a respondent who has more than 200 and fewer than 501 employees ...
> (iv)  In the case of a respondent who has more than 500 employees ...

5 M.R.S.A. § 4613(2)(B)(8)(e) (West Pamph. 2000). Notably absent from this

paragraph are those employers with fewer than 15 employees. It is undisputed that

Mt. Sinai Cemetery Association had only two employees. The Plaintiff is therefore

unable to recover certain compensatory and punitive damages against Mt. Sinai for

Count I.[7]

## II. Intentional and Negligent Infliction of Emotional Distress

The Plaintiff has failed to establish that she suffered severe emotional

distress, a necessary element for both intentional and negligent infliction of

emotional distress. To prevail on an IIED claim, a plaintiff must present facts

---

[7] The Plaintiff may recover civil penal damages not in excess of $10,000, back pay plus interest on back pay, past pecuniary loss, attorneys' fees and costs. See 5 M.R.S.A. § 4613(2)(B)(7) (civil penal damages); 5 M.R.S.A. § 4613(2)(B)(8)(d) (back pay plus interest); 5 M.R.S.A. § 4614 (West 1989) (attorneys' fees and costs).

showing that (1) the defendant intentionally or recklessly inflicted serious[8] emotional distress or was substantially certain that such distress would result; (2) the conduct was "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the defendant's actions caused plaintiff's emotional distress; and (4) the emotional distress suffered was so severe that no reasonable person could be expected to endure it. Champagne v. Mid-Maine Medical Center, 1998 ME 87, ¶ 15, 711 A.2d 842, 847.

Serious emotional distress, while usually manifested by shock, illness or other bodily harm, may be inferred from the extreme and outrageous nature of the defendant's conduct for purposes of an IIED claim. Vicnire v. Ford Motor Credit Co., 401 A.2d 148, 154 (Me. 1979). See also RESTATEMENT (SECOND) OF TORTS § 46 cmt. k (1965) ("[I]f the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without [shock, illness, or other bodily] harm."). It is for the Court to determine "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery." Champagne, 1998 ME 87, ¶ 16, 711 A.2d at 847. "Thus, while the jury must determine whether the elements of the tort were in fact satisfied, the court must first determine whether, as a matter of law, the facts alleged are sufficient to satisfy the elements." Id. Harrisburg's actions, while improper and offensive, are not "so extreme and

---

8 The terms "severe" and "serious" may be used interchangeably to describe the degree of emotional distress necessary to support an intentional or negligent infliction of emotional distress claim. Town of Stonington v. Galilean Gospel Temple, 1999 ME 2, ¶ 11 n.2, 722 A.2d 1269, 1272 n.2. The term "serious" is used in this opinion for consistency.

20

outrageous as to exceed all possible bounds of decency in a civilized community." See id. Emotional distress may therefore not be inferred.

Accordingly, Ms. Lerman must establish through her statement of material facts and appropriate record references that she suffered serious emotional distress to avoid summary judgment. "Serious emotional distress exists where a reasonable person normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event." Town of Stonington v. Galilean Gospel Temple, 1999 ME 2, ¶ 11, 722 A.2d 1269, 1272. This is a necessary element for both intentional and negligent infliction of emotional distress claims. See Gayer v. Bath Iron Works Corp., 687 A.2d 617, 622 (Me. 1996) (holding that to prevail on a NIED claim, plaintiff must prove that the defendant was negligent, that emotional distress to the plaintiff was a reasonably foreseeable result of this negligent act, and that the plaintiff suffered serious emotional distress). Other than asserting that she was hurt and offended by Harrisburg's comments, the Plaintiff's statement of material facts is completely devoid of any evidence that she suffered emotional distress.[9] As this element is common to both the NIED and IIED claims, this Court must grant summary judgment for both Defendants on Counts II and III.

The entry is

---

[9] While the Plaintiff's Complaint states that "Plaintiff has sustained and continues to sustain damages," and that "Plaintiff has suffered and continues to suffer serious emotional distress as a result of Defendant Harrisburg's negligence," those are the only references to any emotional distress suffered. See Complaint ¶¶ 22, 27. The Plaintiff's Statement of Material Facts fails to indicate that she suffered any emotional distress.

21

Robert Harrisburg's motion for summary judgment is GRANTED.

Mt. Sinai's motion for summary judgment is DENIED on Count I but GRANTED on Counts II and III.

Dated at Portland, Maine this 28th day of February, 2001.

Robert E. Crowley
Justice, Superior Court

Date Filed __10-25-99__ _____CUMBERLAND_____ Docket No. __CV 99-613__

County

Action __CIVIL RIGHTS _ CONSTITUTION__

KAREN M. LERMAN

MT. SINAI CEMETERY ASSOCIATION, INC.
ROBERT HARRISBURG

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| DAVID M. HIRSHON, ESQ 874-6700<br>PO BOX 15060, PORTLAND ME 04112 | DANIEL W. BATES ESQ (Harrisburg)<br>10 MOULTON STREET, PM 04101 761-2500<br><br>PATRICIA MCDONOUGH DUNN ESQ 775-7271<br>PO BOX 4510, PM 04112 (MT.SINAI) |

| Date of Entry | |
|---|---|
| 1999<br>Oct. 27<br><br>" " | Received 10-25-99:<br>Complaint Summary Sheet filed.<br>Complaint filed. |
| Nov. 16 | Received 11-15-99.<br>Summons filed showing officer's return of service on 11-5-99 to Robert<br>Harrisburg. |
| Nov. 24 | Received 11.24.99:<br>Defendant Robert Harrisburg's Answer filed. |
| Dec. 1: | Received 12-1-99.<br>Scheduling Order, filed. (Crowley, J.)<br>    Scheduling Order filed.  Discovery deadline is August 1, 2000.<br>Copies mailed David Hirshon, Esq. and Daniel Bates, Esq. on 12-1-99. |
| Dec. 02 | Received 12.01.99:<br>Waiver and Acceptance of Service filed showing service on 11.23.99<br>to Patricia McDonugh Dunn, Esq., on behalf of Mt. Sinai Cemetery. |
| Dec. 16 | Received 12.16.99:<br>Defendant, Mt. Sinai Cemetery Association, Inc.'s Answer and Affirmative<br>defenses filed. |
| Dec. 28 | Received 12.27.99:<br>Plaintiff's Notification of Discovery Service filed.<br>Notice of deposition served on Patricia McDonough Dunn, Esq., Daniel W. Bates<br>Esq., on 12.23.99. |