Harvey R. GREENBERG,
Plaintiff, Appellant,

v.

UNION CAMP CORPORATION,
Defendant, Appellee.

No. 94–1312.

United States Court of Appeals,
First Circuit.

Heard Nov. 9, 1994.
Decided Feb. 17, 1995.

Douglas G. Moxham, with whom Geoffrey R. Bok and Lane & Altman, Boston, MA, were on brief, for appellant.

John T. Murray, with whom Jeffrey K. Ross, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, John A. Nadas, Kevin P. Light, Karen L. Cartotto and Choate, Hall & Stewart, Boston, MA, were on brief, for appellee.

Before CYR, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

Plaintiff-appellant Harvey Greenberg appeals from a directed verdict granted in favor of defendant-appellee Union Camp on Greenberg's claims of wrongful termination due to age and retaliatory discrimination. Because Greenberg failed to adduce sufficient evidence to support a finding of constructive discharge or retaliatory motive, we affirm.

## I.

### Background

In October of 1971, Harvey Greenberg, at age thirty-five, began working as a sales representative for Union Camp.[1] Union Camp hired Greenberg primarily to cover the Maine sales territory for its Dedham, Massachusetts, plant. Union Camp manufactures (and Greenberg sold) corrugated cardboard boxes for industrial and commercial use. Throughout his career at Union Camp, Greenberg resided in Swampscott, Massachusetts.

When Union Camp hired Greenberg, it had virtually no existing customer base in the State of Maine. Greenberg initially spent one week a month prospecting for new accounts in Maine and the rest of the month selling to existing Massachusetts customers. Greenberg, however, successfully built up Union Camp's client base in Maine and in short order concentrated his sales efforts almost exclusively in Maine. Indeed, Greenberg was primarily responsible for securing the Maine client base which was a prerequisite for Union Camp to open a corrugated container plant in Auburn, Maine. By 1977, Union Camp's client base in Maine had grown such that Greenberg's sales territory was narrowed to approximately the southern half of the State of Maine.[2]

Greenberg increased his sales every year, from $190,000 in 1972 to over $5,400,000 in 1989. Greenberg's profit contribution (roughly a measure of how much money Union Camp earned on the sales) consistently compared very favorably with that of other Union Camp sales representatives. Moreover, at least by some measures, Greenberg successfully sold not only to established accounts, but also to new customers.[3] Green-berg received annual pay increases with his compensation rising from about $12,500 in 1972 to almost $65,000 in 1989. In July of 1990, at his annual performance review, Greenberg, who like all Union Camp sales representatives worked on a salary rather than a commission basis, received the largest merit increase of his career.

Throughout most of his nineteen years at Union Camp, Greenberg called on his Maine customers only on Tuesdays, Wednesdays and Thursdays. He attributed this work schedule, at least in part, to his basic sales philosophy that prospective customers were generally too busy for and unreceptive to sales pitches on Mondays and Fridays. During a typical week, Greenberg would leave his home in Massachusetts at 5:30 a.m. on Tuesdays, meet his first customer in Maine at 7:00 a.m. and continue to make sales calls until around 3:00 p.m., when he would check into a motel where he would spend Tuesday and Wednesday nights. Often he would entertain clients on the company expense account during the evenings. Wednesdays, he typically left his hotel at 8:00 a.m. and would call on customers until the middle of the afternoon. On Thursdays starting sometime after 8:00 a.m., he would visit customers while working his way back to Massachusetts, generally arriving home sometime near the middle of the afternoon.

Early in his career, Greenberg reported to the Dedham, Massachusetts, plant on Mondays to speak to supervisors, turn in expense reports and meet with box designers about customer orders. After Greenberg began reporting to the Maine plant in 1983, he still periodically went to the Dedham plant to work with designers until the facility closed around 1986. From 1986 until he left the company, Greenberg generally worked out of

---

1. In 1971, the entity that retained Greenberg was a subsidiary of Union Camp operating under the name Allied Container. About 1985, the Allied Container subsidiary adopted the Union Camp logo. For purposes of this opinion, we will refer to Greenberg's employer, whether before or after 1985, as Union Camp.

2. By 1977, Greenberg had essentially discontinued calling on any Massachusetts customers.

3. The parties disputed Greenberg's performance in securing and selling new accounts. In main-taining that he performed well in this area, Greenberg pointed out that he ranked third, second and first for the years 1987, 1988 and 1989, respectively, in terms of square feet of corrugated cardboard sold to new accounts. Union Camp, on the other hand, pointed to other measures, that indicated whether the new-account customers were one-time purchasers or became recurring customers, which shed a less favorable light on Greenberg's performance.

his home on Mondays and Fridays, completing paperwork[4] and making telephone calls to the plant and to customers. Greenberg normally finished this work before noon, usually leaving the rest of the day for personal matters. Greenberg periodically did visit a New Hampshire customer on Mondays.

In 1987, Union Camp assigned Gerald Redman to the Auburn, Maine, plant as plant manager. In the summer of 1987 at Greenberg's annual performance review, Redman told Greenberg that, "[y]our reputation goes all the way to Wayne [ (Union Camp's headquarters) ], you don't work Monday and Friday. If it ever gets to be a problem, I will be the first to tell you about it." Bob Ritter, the Maine plant sales manager, testified that, at this meeting and at Greenberg's 1988 performance review, Greenberg stated that he intended to retire at age fifty-five.

In November 1989, Redman and Ritter required Greenberg and the other sales representatives to make presentations regarding their top five new-account prospects. Redman was extremely dissatisfied with Greenberg's performance at his individual meeting, and Greenberg described the meeting as "two hours of insults and threats." At one point during the meeting, Greenberg stated, "I don't have to listen to this garbage anymore," and threatened to walk out. At another, Greenberg commented to Redman that there seemed to be "[a] sword of [D]amocles hanging over my head in my best sales year." To which Redman responded, "You'd better believe it." Ritter testified that at this meeting he told Greenberg that

his three-day schedule was not satisfactory. Though Greenberg maintained that he was not ordered at this point to make sales calls on Mondays and Fridays, he admitted that his work schedule may have been discussed. Following the meeting, Greenberg avoided speaking with Redman and Ritter except as business required.[5]

Greenberg asked Ritter to visit some customers with him in February of 1990. During the trip, the two discussed the previous November meeting. Greenberg testified that they also discussed Greenberg's own belief that Union Camp's sales force was too old.[6] He also admitted that they may have discussed his work schedule and sales philosophy, but he did not specifically recall.

At a meeting in May 1990, Ritter asked Greenberg, who would turn fifty-four the following July, whether he had plans to retire early at age fifty-five. Though Greenberg testified that he had never told anyone at Union Camp that he intended to retire early, he admitted that a story he often told about his father might have suggested that he wished to do so.[7] During the meeting, Greenberg told Ritter that there was no way he could afford to retire early. Directly following the meeting, Ritter informed Redman that Greenberg did not intend to retire early. Redman testified that this fact increased the need to do something about Greenberg's work schedule.

In July 1990, Ritter gave Greenberg his annual review, at which he told Greenberg

4. The paperwork consisted of expense and sales-call reports. Greenberg testified that, for the last several years of his career, he filled out identical sales-call reports every other week. He stated that, though in general they reflected his activities, they did not accurately state on a day-to-day basis the clients he visited.

5. Greenberg also testified that his expenses were discussed during this meeting. He recalled stating "I never pocketed a nickel." Redman replied, "It better be that way."

   At trial, Greenberg admitted that he often entertained individuals who were not Union Camp customers and later attributed the cost of the entertainment on his expense reports to actual clients. Greenberg resolutely maintained, however, that the expenditures always benefitted Union Camp, albeit sometimes indirectly.

6. Greenberg had previously brought this point to both Redman and Ritter's attention. Deposition testimony of Greenberg's replacement read into the record at trial established that, at the time of the deposition, three of seven sales representatives at the Maine plant were older than age forty. Though not elicited as a fact in Greenberg's case-in-chief, Redman, who testified and was present for the four days of trial, is five years older than Greenberg.

7. Greenberg's written performance reviews dated February 1989 and February 1990, include the statement "Retirement in the near future," under a section entitled "Career Development." Greenberg neither signed nor saw these reviews prior to leaving the company.

about his raise, which was the largest of Greenberg's career, and about areas of his job performance that needed improvement. Following the meeting, Ritter sent Greenberg a letter purporting to summarize the main points of the review. Ritter noted in the letter that he had informed Greenberg that he must show improvement "in the immediate future" in areas of "base accounts, new account development, communication with management, work schedules, expenses and communication." More specifically, Ritter wrote:

New account penetration in recent years has been unsatisfactory. Regardless of base account level, new account focus, planning and development must improve. Work habits and methods must be reviewed with action taken to better utilize open available weekly time to achieve job responsibilities. Not communicating with management because of the difference of opinion is unacceptable, and actions such as these cannot occur again.

Greenberg testified that he could not recall Ritter counselling him about any significant performance problems in past reviews.[8]

Greenberg responded with a four-page missive of his own, dispatched to Ritter and Redman, in which he contested the substance of Ritter's complaints. Though Greenberg testified at trial that the fact that he only called on customers on Tuesdays, Wednesdays and Thursdays was not discussed at his review, in his letter he specifically responded: "[']Work habits and methods [ (referring to Ritter's letter) ]....['] We have talked about this before and my position has never changed.... It's been my experience that successful salesmen have different methods

and if they are successful they should be rewarded [and] not made to walk to the same beat of some drummer." (Second ellipsis added).

Redman replied to Greenberg with a short letter stating:

We received your letter of August 18, 1990, and we would prefer not to continue a letter writing exchange regarding your Sales Philosophy.

Bob Ritter's memo of August 8, 1990 was written to document the fact that your performance has not been up to expected standards in the areas of: expenses, expense reporting, communications, work schedules and new account penetration. The memo also intended to emphasize the seriousness of continued resistance to change and critical opposition to suggestions for improvement.

After receiving this letter, Greenberg consulted a lawyer, who, on September 13, 1990, wrote to Redman's superior suggesting that Greenberg was being subjected to age discrimination. On September 19, 1990, shortly after Union Camp received this letter, Redman and Ritter met with Greenberg and informed him that, from that point on, he was expressly required to spend five days a week in his sales territory. Greenberg requested time to consider this requirement and Redman agreed, telling Greenberg to "'take time to think about it.'"

Finally, at a meeting nearly a month later on October 15, 1990, Greenberg refused to sign a letter that explicitly listed six conditions of employment that he would be required to meet, including the five-days-in-the-sales-territory requirement.[9] Green-

---

8. Greenberg's unsigned performance reviews from 1987 to 1990 rate him as either an excellent or effective employee. Areas needing attention or improvement, however, are listed as "[p]rospecting and attention to detail" (February 1987); "time in marketplace, tolerance/understanding to differing opinions" (April 1987); "[a]cknowledgement and adaptability to changing conditions. Time Management and prospecting" (February 1989); "[a]cknowledgement & adaptability to changing conditions. Time management and prospecting." (February 1990). The February 1990 review also states, "Salesman understands consequences of performance level drop with present inclination not to change work

methods & time management issues presented to him."

9. The six conditions were stated as follows:

1. You must present a plan analyzing your top 10 new account prospects as to total dollar potential, how each account fits our mix and volume profile, our present sales position with each project, and an immediate action plan for penetrating the accounts.
2. Call the Sales Manager or General Manager every Monday, Wednesday, and Friday (or on a daily basis whenever conditions warrant) to communicate account problems or con-

berg's decision not to sign the letter ended his employment relationship with Union Camp. Subsequently, no other sales representative, including Greenberg's replacement, was required to sign a similar document. Moreover, Union Camp has never made five days in the sales territory an explicit job requirement for any other sales representative.

Greenberg brought this action in the district court alleging that Union Camp terminated his employment in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634. Greenberg alleged that Union Camp's actions were motivated by an anti-age animus and a desire to retaliate against Greenberg for seeking to invoke his ADEA-protected rights. Following the close of Greenberg's case, the district court granted Union Camp's motion for a directed verdict, holding that Greenberg had failed to show any evidence of age discrimination and that Union Camp "did not terminate [Greenberg] but that [Greenberg] left [Union Camp's] employment because he blatantly refused to work five days a week in the territory of Maine as required by his employer." This appeal followed.

## II.

### Discussion

We review *de novo* a district court's decision to grant a motion for a directed verdict (or more properly judgment as a matter of law), employing the "same stringent standard incumbent upon the trial court in the first instance." *Favorito v. Pannell*, 27 F.3d 716, 719 (1st Cir.1994). In performing this task, we take the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion and ask whether a rational jury could find in that party's favor. *E.g., Murray v. Ross–Dove Co.*, 5 F.3d 573, 576 (1st Cir.1993).

### A. Age Discrimination Claim

In a wrongful termination case under the ADEA, the plaintiff must establish " 'that his years were the determinative factor in his discharge, that is, that he would not have been fired but for his age.' " *Mesnick v. General Elec. Co.*, 950 F.2d 816, 823 (1st Cir.1991) (quoting *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir. 1988)), *cert. denied*, —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *see also Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 478 (1st Cir.1993). Where direct evidence of discriminatory animus is lacking, the burden of producing evidence is allocated according to the now-familiar *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 719 (1st Cir.1994).

Under the *McDonnell Douglas* framework, the employee must initially come forward with sufficient evidence to establish a prima facie case of discriminatory discharge. Thus, here, Greenberg needed to establish that (i) he is a member of a protected class, *i.e.*, over forty years of age, (ii) his job performance was sufficient to meet Union Camp's legitimate job expectations, (iii) he was actually or constructively discharged, and (iv) Union Camp sought a replacement with roughly equivalent qualifications. *Vega*, 3 F.3d at 479; *see also Sanchez*, 37 F.3d at 719. Once the plaintiff has met this relatively light burden, a presumption of discrimination arises and the onus is then shifted to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Mesnick*, 950 F.2d at 823. If the employer produces such a justification, the presumption of discrimination vanishes and the burden shifts back to the plaintiff to show that the employer's alleged justification is merely pretext for discrimina-

cerns, review competitor actions, and update management on market conditions.

3. Provide Sales Manager with written feedback on customer reaction to quotations within 30 days of the quotations being issued.

4. Increase weekly sales calls from current average of 12–13 to a minimum of 20 per week.

5. Maintain 5 day sales schedule in your territory and be actively involved in making customer calls Monday through Friday.

6. Accurately report expenses incurred in entertaining customers. Reduce customer entertainment expenses by 15% in July through December, 1990 from January through June, 1990's expenses.

tion. *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260 (1st Cir.1994).

Greenberg's termination claim fails at the outset, however, because he has not adduced sufficient evidence from which a jury could reasonably conclude that he was constructively discharged. Greenberg maintains that Union Camp constructively discharged him by requiring him to sign the October 15 letter, which explicitly listed six job requirements that he needed to fulfill. Except for the requirement that he make sales calls in his territory five days a week, Greenberg testified that he was substantially complying with the conditions listed in the letter. Primarily, Greenberg contends that, by requiring him to spend two additional days a week making sales calls in Maine, Union Camp constructively discharged him. We disagree.

It is well settled in this Circuit that, to establish a claim of constructive discharge, the evidence must support a finding that " 'the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986) (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)); *see also Vega*, 3 F.3d at 480 (new conditions must make work so "arduous," "unappealing" or "intolerable" that a reasonable person would resign). The legal standard to be applied is "objective," with the inquiry focused on "the reasonable state of mind of the putative discriminatee." *Calhoun*, 798 F.2d at 561 (internal quotations omitted). Consequently, "an employee may not be unreasonably sensitive to his or her working environment." *Id.* (internal quotations omitted); *see also Vega*, 3 F.3d at 476.

Within the context of this case, we believe that no rational jury could find that requiring Greenberg to spend two additional days in Maine making sales calls to be so intolerable that a reasonable person in Greenberg's shoes would have felt compelled to resign. Initially, we note that Greenberg does not assert that the new conditions would be humiliating or demeaning, often an important factor in evaluating a claim of constructive discharge. *See, e.g., Aviles-Martinez v.*

*Monroig*, 963 F.2d 2, 6 (1st Cir.1992) (sufficient evidence to find constructive discharge where evidence included scolding and ridiculing plaintiff in front of clients on a daily basis). Moreover, in explicitly imposing the six conditions on Greenberg, Union Camp did not demote Greenberg or reduce his pay or total compensation. *See, e.g., Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888–89 (3d Cir.1984) (constructive discharge where, along with other factors, change in sales representative's territory constituted substantial cut in pay); *cf. Nunez-Soto v. Alvarado*, 918 F.2d 1029, 1030–31 (1st Cir.1990) (demotion without salary cut insufficient for constructive discharge). Indeed, at his July 1990 review, just prior to imposing the conditions of employment, Union Camp gave Greenberg the largest merit increase of his career. In effect, Greenberg contends that the requirement is intolerable because it would require him to spend more time on the road, and possibly (though not necessarily) another weeknight or two away from home. In the context of this case, this is not enough.

Greenberg was a sales representative. It is hardly unreasonable for an employer to expect its sales representatives to spend their workdays making sales calls. That calling on his customers meant spending time on the road is more an unhappy aspect of Greenberg's vocation than an unreasonable or intolerable working condition. *See Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1254–56 (4th Cir.1985) (no constructive discharge where conditions, though unpleasant, are part and parcel to the job), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986).

Requiring Greenberg to spend two additional days in Maine appears burdensome only if we focus narrowly on the fact that Greenberg resides in Massachusetts. The degree to which requiring Greenberg to work two additional days in Maine is unreasonable, however, must be measured within the context of this case. Union Camp originally hired Greenberg specifically to be its sales representative for the State of Maine. Therefore, Greenberg, who lived in Massachusetts at the time, accepted employment knowing that he was hired to sell to Maine

customers.[10] Thus, this case is distinguishable from one in which an employee who lives and works in one city is offered the choice between termination and a transfer to another city. *See Hazel v. United States Postmaster Gen.*, 7 F.3d 1, 5 (1st Cir.1993) (suggesting that transfer from one city to another would support finding of constructive discharge); *but see Cherchi v. Mobil Oil Corp.*, 693 F.Supp. 156, 162–64 (D.N.J.) (no constructive discharge where employer offered transfer from New Jersey to Baltimore), *aff'd*, 865 F.2d 249 (3d Cir.1988). Because Greenberg voluntarily chose to work as the sales representative for the Maine territory, while living in Massachusetts, he cannot now complain of changes in his work schedule that would not be burdensome but for that choice.

Nonetheless, Greenberg makes much of the fact that Union Camp did not explicitly impose the mandatory five-day-a-week-sales-call condition on any of its other sales representatives or his younger replacement. He argues that this disparate treatment amply supports a finding of constructive discharge. Union Camp officials, however, all testified that the condition was a basic, albeit unwritten, requirement of the sales representative position. Moreover, Greenberg does not point to any other sales representative who similarly made calls in his or her assigned territory only three days a week that Union Camp treated differently. At most, Greenberg elicited testimony from his replacement that, due to the need to finish paperwork, handle customer requests and/or complaints, and tend to other vagaries of the job, he occasionally passed a day without making sales calls, but nonetheless was not required to sign a similar conditions-of-employment statement. This evidence is insufficient.

*See Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir.1994) ("In a disparate treatment case, the plaintiff has the burden of showing that she was treated differently from persons situated similarly *in all relevant aspects.*" (internal quotations omitted)).[11]

Moreover, our conclusion is buttressed by the fact that Greenberg couples his allegation of constructive discharge with virtually no evidence that Union Camp's motives stemmed from an animosity towards age. Direct or circumstantial evidence of a discriminatory animus could help substantiate a claim that one's working conditions had become intolerable to an unreasonable degree. *See, e.g., Acrey v. American Sheep Indus.*, 981 F.2d 1569, 1574–75 (10th Cir.1992) (employer request that employee quit on account of age cited as evidence of both animus towards age and unreasonable working conditions); *Goss*, 747 F.2d at 888 (verbal abuse that conveyed animosity towards employee's gender supported finding of constructive discharge). As evidence of age discrimination, Greenberg, however, essentially points to just two factors—(1) the single May 1990 inquiry concerning Greenberg's retirement plans, and (2) the fact that no employee over age forty had been hired by Union Camp at the Maine plant during Redman's tenure as plant manager.

A single inquiry by an employer as to an employee's plans for retirement, however, does not necessarily show animosity towards age. *See Colosi v. Electri–Flex Co.*, 965 F.2d 500, 502 (7th Cir.1992). An employer may legitimately inquire about an employee's plans so that it can prepare to meet its hiring needs. Though repeated and/or coercive inquiries can clearly give rise to a reasonable inference of an anti-age bias (and lend sup-

---

10. Nowhere does Greenberg assert that he originally accepted employment with Union Camp on the condition that he spend no more than three days a week calling on Maine customers.

11. Greenberg relies on *Hazen Paper Co. v. Biggins*, —— U.S. ——, ——, 113 S.Ct. 1701, 1708, 123 L.Ed.2d 338 (1993), which he asserts establishes that an employee who refuses to sign an onerous job contract not imposed on a younger replacement is constructively discharged. While this premise may be true (though we do not agree that the Supreme Court specifically ad-

dressed the issue), Greenberg has failed to show that the "contract" here was sufficiently onerous. In *Hazen*, the contract included a non-compete clause that would have prohibited the employee, who was a trained chemist, from working in his field of expertise for two years after leaving the company. *Biggins v. Hazen Paper Co.*, 953 F.2d 1405, 1411 (1st Cir.1992), *vacated*, —— U.S. ——, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Union Camp sought no such restriction on Greenberg's future employment.

port to a finding of constructive discharge), *see Calhoun,* 798 F.2d at 562–63 (three inquires over seven months coupled with demotion requiring employee to report to younger person employee had previously trained, and threat of onerous working conditions if no resignation), that is not the case here. Greenberg alleges only that Ritter made a single inquiry at the May 1990 meeting as to whether Greenberg had plans to retire at age fifty-five. Moreover, though Greenberg testified that he never told Ritter or Redman that he intended to retire early, he admitted that an anecdote he frequently recounted could have led them to think he desired to do so.

The fact that Union Camp's Maine plant did not hire any employees over age forty during Redman's tenure as plant manager adds little to Greenberg's claim. As we have noted before, without any attempt to establish the demography of the available hiring pool, this evidence has little probative value. *See LeBlanc v. Great Am. Ins.,* 6 F.3d 836, 848 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *cf. Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1119 n. 5 (1st Cir.1993). Moreover, Greenberg offered no evidence at trial concerning the number of employees actually hired, thus precluding any reasonable evaluation of the statistical data in terms of sample size. Finally, that two years after his departure three of seven sales representatives employed at the Maine plant were over age forty, and that Redman, himself, was five years older than Greenberg, makes any inference of animosity towards age on this evidence dubious at best. Therefore, Greenberg's proffered evidence of anti-age bias provides little support for his claim of intolerable working conditions and consequent constructive discharge, and thus his age-bias claim falls short.

*B.   Retaliatory Claim*

Greenberg's claim of retaliatory discrimination likewise fails because no rational jury could conclude on this evidence that Union Camp acted with a retaliatory motive in requiring Greenberg to work five days a week in his sales territory. *See Mesnick,* 950

F.2d at 827 (plaintiff must show that employer's reason for adverse action taken against employee is pretext masking retaliation for employee invoking · his ADEA-protected rights). Even taking the evidence in the light most favorable to Greenberg, it is clear that his work schedule had been an issue with his superiors at Union Camp since at least the November 1989 meeting. Moreover, it is not disputed that Greenberg did not adjust his work schedule in response to the August 8 letter, in which Ritter unequivocally wrote, "Work habits and methods must be reviewed with action taken to *better utilize open available weekly time to achieve job responsibilities.*" (Emphasis added).

Greenberg responded to this directive with his own letter stating, *"We have talked about this before and my position has never changed....* It's been my experience that successful salesmen have different methods and if they are successful they should be rewarded [and] not made to walk to the same beat of some drummer." (Emphasis added). Furthermore, Redman's August 28 letter clearly warned Greenberg that Ritter's letter "was written to document the fact that [Greenberg's] performance ha[d] not been up to expected standards in the areas of: expenses, expense reporting, communications, *work schedules* and new account penetration." Redman concluded by stating that Ritter's letter was "intended to emphasize the *seriousness of continued resistance to change and critical opposition to suggestions for improvement.*" (Emphasis added).

Any rational view of these interchanges makes clear that Greenberg's continued refusal to adapt his work schedule would result in further action by Union Camp. Hence, no rational jury could conclude that the September 19 order directing Greenberg to spend five days a week in his sales territory ensued because Union Camp sought to retaliate against Greenberg for invoking his ADEA rights. Rather, the order was the inexorable result of Greenberg's persistence in refusing to modify his work schedule. *See Mesnick,* 950 F.2d at 828 (ADEA should not permit a disgruntled employee to "inhibit a well-deserved discharge [or other sanction] by

merely filing, or threatening to file, a discrimination complaint.").

## III.

### Conclusion

In sum, because Greenberg failed to adduce sufficient evidence to support a finding of constructive discharge or retaliatory motive, the district court did not err in granting Union Camp's motion for a directed verdict on the claims of age and retaliatory discrimination. Accordingly, the decision of the district court is

**affirmed.**