**Harold JETTER, Plaintiff,**

**v.**

**KNOTHE CORP., Richard Bern, Brian Minkoff, Ely Minkoff, and William Nomberg, Defendants.**

No. 00 CIV. 2124(NRB).

United States District Court,
S.D. New York.

Jan. 31, 2002.

Steven M. Post, Phillips, Nizer, Benjamin, Krim & Ballon, L.L.P., New York, NY, for Harold Jetter.

Mark N. Reinharz, Rains & Pogrebin, Mineola, NY, for Knothe Corp., Richard Bern, Brian Minkoff, Ely Minkoff, William Nomberg.

## OPINION AND ORDER

BUCHWALD, District Judge.

Plaintiff Harold Jetter ("Jetter" or "plaintiff") brings this action for age discrimination against his former employer, the Knothe Corporation ("Knothe"), and several of its officers (collectively, "defendants"). Jetter alleges that he was terminated by Knothe in violation of the Age Discrimination in Employment Act (ADEA), *see* 29 U.S.C. §§ 621 et seq., the New York State Human Rights Law, *see* N.Y. Exec. L. §§ 290–301, and New York City Civil Rights Law, *see* N.Y.C. Admin. Code, Title 8, §§ 101 et seq.   Plaintiff

further alleges state law breach of contract and fraud claims.

Now pending is defendants' motion for summary judgment on all claims, and plaintiff's cross-motion for summary judgment on his breach of contract claim. For the following reasons, defendants' motion is granted with respect to plaintiff's federal claims under the ADEA. As there is no other basis for federal jurisdiction over this case, we decline to exercise jurisdiction over the remaining claims under 28 U.S.C. § 1367. Accordingly, the remainder of defendants' motion and plaintiff's cross motion are denied without prejudice and the case is dismissed.

### BACKGROUND

The facts as agreed upon by the parties are as follows.[1] Plaintiff and his two brothers, Seymour and Bernard, cofounded sleepwear manufacturer and distributor General Nitewear Corporation ("GNC") in 1966. Plaintiff served as its President and Chief Executive Officer for the thirty plus years that the brothers operated the company together. Knothe, a former competitor of GNC, is mainly a sleepwear distributor. In late 1996 or early 1997, Knothe owner William Nomberg ("Nomberg") and Chief Financial Officer Richard Bern ("Bern") discussed rumors that GNC was having financial difficulties and was up for sale. Because Knothe executive Ely Minkoff knew plaintiff, Bern asked Ely Minkoff to approach plaintiff about these rumors. According to defendants, Ely Minkoff expressed concern at that time to Bern and his son, Knothe executive Brian Minkoff, that plaintiff was quite stubborn and would have a hard time relinquishing control of GNC. In fact, GNC's financial condition had taken a downturn and under the advice of an informal committee of creditors directed by a company called MMG, plaintiff's brothers wanted to sell the company. Despite Ely Minkoff's reservations, Knothe negotiated a financial arrangement with plaintiff and GNC whereby Knothe purchased all of GNC's assets and created a Knothe division called General Nitewear. The Asset Purchase Agreement ("the Agreement"), which was executed on June 27, 1997, covered all of the transactions between Knothe and GNC including employment agreements between Knothe and all three Jetter brothers.[2] Because plaintiff did not wish to retire, and because his brothers knew of his desire to continue working, plaintiff asserts that his employment with Knothe as managing director of General Nitewear was essential to the Agreement.[3] At that

---

1. Unless specifically noted, all facts stated herein are drawn from plaintiff's complaint and the parties' submissions in connection with the present motion. The latter include their Local Rule 56.1 Statements, deposition transcripts, affidavits or declarations, and other exhibits attached thereto.

2. The asset purchase is memorialized in one contract, the "Asset Purchase Agreement," and plaintiff's employment contract is referenced in this agreement and attached as an exhibit. In the parties submissions, the Asset Purchase Agreement can be found attached to the Jetter Affidavit as Exhibit D and Knothe's employment contract with plaintiff is attached to the Jetter Affidavit as Exhibit E.

3. There is some dispute as to the extent to which Knothe offered plaintiff this position merely because the Jetter brothers made the asset sale conditional on this aspect of the agreement. The Asset Purchase Agreement states that "[t]he parties acknowledge that such employment agreements and full and complete performance of all the terms thereof by all the parties thereto are an integral part of the considerations to be given and received by each of the parties to this Agreement." Jetter Aff., Attach. Ex. D at 50. Plaintiff asserts that defendants never wanted him to remain at the company, and just entered the contract in order to purchase GNC's assets. Defendants assert that they were interested as

time, plaintiff was 70 years old and his brothers Bernard and Seymour were 67 and 72 respectively.

Under the Agreement, Seymour and Bernard were given three year sales positions and compensated primarily by commission. *See* Jetter Aff., Attach. Ex. G. Bernard became ill and passed away several months after the Agreement was executed but Seymour continues to work for Knothe as a sales representative. Unlike Knothe's agreements with his brothers, plaintiff's agreement provided for a 5 year employment contract at a yearly salary of $156,000, during which time plaintiff was to serve as Managing Director of the General Nitewear Division of Knothe. The contract provides that plaintiff was also to "perform such duties as the President of the Corporation shall from time to time assign to Employee which are commensurate with Employee's position." *See* Jetter Aff., Attach. Ex. E at 1–2. Further, the contract contains a non-compete covenant, which states that upon termination[4], "the Employee hereby agrees that until one (1) year after termination of his employment with the Corporation, he shall not, without the prior written consent of the Corporation, engage, or become interested in any capacity...in any business...which business shall be competitive with any business of the Corporation."[5] *Id.* at 4.

While plaintiff and defendants do not completely agree on the scope of the problems that arose after plaintiff commenced his employment with Knothe, it is apparent from both accounts that the relationship was tenuous. Affidavits from six Knothe employees and executives describe myriad performance problems Knothe had with plaintiff once he took his position as the manager of the General Nitewear division. Problems raised in these affidavits include the untimely submission of orders, bypassing the required credit check by placing orders directly with the factories, offering customers unauthorized prices and terms, interfering in the workings of the production department, and buying fabrics without authorization. Knothe employees also describe how plaintiff frequently criticized Knothe's management, openly saying "they do not know what they are doing." Bern describes one incident in particular, where he accompanied plaintiff to the Tennessee factory for the announcement of its purchase and plaintiff, "basically in front of Mr. Nomberg and his plant manager, had a ten minute dissertation about how we screwed him out of his business. I'm not talking about a nice dissertation. I'm talking angry, fed up, like literally we had done something horrible to him." *See* Defs.' Ex. 2, Bern Depo. at 205. Further, affidavits from numerous Knothe employees and executives characterize plaintiff's workplace temperament as hostile, describing how plaintiff routinely yelled at his coworkers. In short, defendants present significant evidence that plaintiff was completely disorganized, difficult to work with, and wholly unwilling to conform his practices to the internal proce-

well in plaintiff's industry experience and knowledge.

4. By its terms, plaintiff's contract could be terminated by his death or long-term incapacity, for his material breach of the Agreement, or for "Cause." Defined as "such misconduct as shall constitute, as a matter of law, a breach of the covenants and obligations of Employee hereunder," terminations for "Cause" required Knothe to provide notice and a thirty day cure period. *See* Jetter Aff., Attach. Ex. E at 3.

5. Under the contract, plaintiff also could not be engaged or employed during the period of his employment by Knothe in any other business or occupation. *See* Jetter Aff., Attach. Ex. E at 2.

dures required by Knothe subsequent to the asset purchase.

When asked about these performance issues at his deposition, plaintiff's responses were rather oblique. When asked whether he had difficulties working with anyone in the office, plaintiff responded, "I don't remember." When asked whether he argued with anyone, plaintiff answered, "Possibly." Asked whether he ever yelled at anybody in the office, plaintiff attributed his yelling to bad hearing but admitted that when frustrated, he might have "yelled at the problem" but not at a person. When asked whether he remembered berating any employees, plaintiff again responded, "I don't remember." In addition, though plaintiff alleged in his complaint that he alone was denied secretarial or other support staff, he could not name a single secretary at Knothe, loosely charging that other managers and executives seemed to get help around the office. Further, plaintiff admitted to making derogatory comments about the management, stating "I don't think they knew what they were doing with my accounts," and also admitted that he let it be known that he wished to be bought out of his contract. *See* Defs.' Ex. 1, Jetter Depo. at 111–23, 130.

In October of 1997, Bern, Nomberg, Brian Minkoff, and Ely Minkoff met together with plaintiff in Atlanta, and defendants' affidavits assert that they discussed these performance problems.[6] In February of 1998, Bern sent plaintiff a memorandum itemizing some of these performance problems. *See* Defs.' Ex. 8. Shortly thereafter, another such meeting was held in New York between Bern, Brian Minkoff, Ely Minkoff, and plaintiff. Defendants assert that plaintiff's performance did not subsequently improve and that as a result of plaintiff's mismanagement, Knothe was threatened with the loss of business from Blair Corp. and did lose one of their biggest customers, Montgomery Ward.

Then, at the end of March, Knothe purchased State–O–Maine from Nautica, Inc. Knothe claims that as a result of this acquisition, in the summer of 1998, Knothe decided to eliminate the distinction between the Knothe and General Nitewear divisions of Knothe, a transition which was to take place during Fall, 1998, and eliminate the organizational divisions between the three merged companies. With the elimination of the divisions, all accounts would be consolidated under one Knothe salesperson rather than customers dealing with multiple salespersons. Further, a former employee of State–O–Maine, Maria Zoccoli ("Zoccoli"), was made Vice–President of Knothe and all sales representatives reported directly to her. *See* Jetter Aff., Attach. Ex. L and M (contrasting organizational structure of Knothe before and after reorganization). Affidavits from Knothe employees assert that as a result of the reorganization, plaintiff's accounts as well as the accounts of other salespersons were redistributed within the company. *See, e.g.,* Lieb Aff. at ¶ 9 (noting that several of his accounts were given to other people, including Zoccoli).[7] Jetter asserts

---

**6.** Plaintiff denies that there was any discussion about his performance at the Atlanta meeting, but recalls the later discussion in New York. *See* Jetter Depo., Defs.' Ex. 1 at 126.

**7.** Plaintiff seems to be of several minds as to the reason his accounts were reassigned. Although plaintiff stated at his deposition that

someone at Knothe explained the reorganization to him at the time, in his affidavit plaintiff disputes that a reorganization of Knothe ever happened and claims that the distribution of his accounts to Zoccoli, who is younger than plaintiff, was an act of age discrimination. *See* Jetter Aff. ¶¶ 27–30; Jetter Depo., Defs.' Ex. 1 at 167. However, this contradicts Jetter's statement at his deposition that

that his accounts were taken away and given to other people and that his job responsibilities were terminated on account of his age.

During July of 1998, Bern sent a letter to plaintiff notifying him of several duties he was to perform, and ostensibly listing as one of those duties that at the end of the year, Jetter's "presence at Knothe will no longer be required." · See Defs.' Ex. 9. The letter further stated, "as long as you do not participate in any sales or other apparel positions we will will [sic] continue to honor our financial obligations under your employment contract." Id. After plaintiff received the letter, Bern and plaintiff also discussed the possibility that plaintiff could find other employment in the industry without violating his contract, conditional on Knothe's approval and/or modification of the employment agreement. See Jetter Aff. ¶¶ 25–26; Bern Aff. ¶¶ 49–50.

Then, the end of the year date for plaintiff's departure was abruptly moved up in mid-December when plaintiff's attorney contacted Knothe to inform management that plaintiff believed Knothe had breached the employment contract, discriminated against plaintiff based upon his age, and owed plaintiff all of his salary up front with penalties. At that point, plaintiff was instructed to move his belongings out of his office at Knothe. Defendants assert that this decision was made because "the atmosphere in the office had turned from cordial to confrontational." See Bern Aff. ¶ 52. Plaintiff asserts that defendants' subsequently notified plaintiff's business contacts that he had retired, in an alleged attempt to preclude alternate employment by the plaintiff. See Jetter Aff. ¶ 32.

For the rest of December, through January, and into February, Knothe paid plaintiff's salary and benefits and allowed him to keep his company car. In late January or early February, defendants learned through a sales representative of Knothe that plaintiff had had discussions with B.C. Moore about doing business with Host Apparel, a Knothe competitor. See Jetter Aff. at ¶ 36 (reprinting transcript of voice mail from Knothe sales representative describing his conversation with B.C. Moore employee). Then, defendants received a February 18, 1999, letter from plaintiff's attorney Steven M. Post ("Post"). In this letter, Post notified defendants that they had breached plaintiff's employment contract by terminating his contract without cause as defined in the Agreement, and that "in view of Knothe's breach, Mr. Jetter is no longer bound by any restrictive covenant contained in the contract." See Defs.' Ex. 10. In a February 19, 1999, letter from Bern to plaintiff, Knothe terminated plaintiff's employment "for cause," citing refusal to perform assigned duties, solicitation of business from Knothe customers on behalf of competitors, and unwillingness to be bound by the restrictive covenant in the Agreement. See Defs.' Ex. 11. At the time of his termination, plaintiff was 71 years of age. Having brought the requisite charge of discrimination and retaliation with the Equal Employment Opportunity Commission, plaintiff filed this lawsuit.

## DISCUSSION

Plaintiff alleges that defendants intentionally discriminated against him due to his age and then retaliated against him for asserting his legal rights, in violation of

---

after State–O–Maine's employees came to work at Knothe, he was replaced because Zoccoli had more influence with Knothe and "I was too strong for [Zoccoli and Knothe

President Steve Taglia]. I knew too much, I knew too many people and I did my business well." See Jetter Depo., Defs.' Ex. 1 at 367–68.

the Age Discrimination in Employment Act (ADEA), *see* 29 U.S.C. §§ 621 et seq., the New York State Human Rights Law, *see* N.Y. Exec. L. §§ 290–301, and New York City Civil Rights Law, *see* N.Y.C. Admin. Code, Title 8, §§ 101 et seq. Further, plaintiff asserts breaches of the contract between Knothe and GNC as a third-party beneficiary, as well as a breach of the contract between Knothe and plaintiff himself. Finally, plaintiff asserts a fraud claim for false representation of employment opportunities with Knothe to induce plaintiff to enter into the purchase agreement.

## A. Summary Judgment Standard

Summary judgment is properly granted where the " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.' " *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing the record, we are required to assess the evidence "in the light most favorable to the non-movant and ... draw all reasonable inferences in [the non-movant's] favor." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990). The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment. In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (internal quotation omitted).

In considering defendants' motion for summary judgment, we are mindful that summary judgment is "ordinarily inappropriate" in the context of a workplace discrimination case because the allegations usually require exploration into an employer's true motivation and intent for making a particular employment decision. *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984). However, this caution does not absolve the plaintiff from the responsibility of producing sufficient evidence from which a reasonable juror could return a verdict in his or her favor. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even in the discrimination context where intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). Where a plaintiff does not credibly call into question an employer's non-discriminatory explanation for its motives, summary judgment for the defendant continues to be appropriate. *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000) (affirming that even post-*Reeves*, "in appropriate circumstances" a court may still grant summary judgment on a discrimination claim).

## B. Age Discrimination Claim

The ADEA provides that it is "unlawful for an employer ... to fail or refuse or otherwise to hire or to discharge any individual or otherwise discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The critical issue in an ADEA case, as in any discrimination case, is one of proof of discriminatory intent on the part of the defendant. "[L]iability depends on whether the protected trait (under the ADEA, age) *actually* motivated the employer's decision." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (emphasis added). In applying this standard, we note that "our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir.1999)(*cited in Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93 (2d Cir.2001)). Further, it is appropriate for the Court to consider the employer's criteria for job performance as well as stated expectations for the employee, provided that the employee is allowed an opportunity to show that the employer's demands for the position were illegitimate or made in bad faith. *Thornley v. Penton Pub'g, Inc.,* 104 F.3d 26, 29 (2d Cir.1997) (explaining that the question is whether the employee has satisfied the employer's "honestly-held expectations").

Because allegations of age discrimination are, as here, so often based on circumstantial evidence, they are analyzed using the three-step burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 639 (2d Cir.2000). Under the *McDonnell Douglas* framework, our first inquiry is whether plaintiff has established a prima facie case of discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S.

502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the plaintiff has so pled, then a presumption of discriminatory animus is established and the burden shifts to defendant to produce evidence of a legitimate, non-discriminatory reason for its actions. *See Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Assuming that defendant can produce such a justification, then the presumptions and burdens of the McDonnell Douglas framework drop away, and only the ultimate question of "discrimination *vel non*" remains. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)).

Plaintiff has adequately stated a prima facie case. However, defendants' have produced a legitimate, non-discriminatory reason for their actions, thereby eliminating all presumptions and burdens of the McDonnell Douglas framework. Because we conclude that plaintiff has not marshaled sufficient evidence for a reasonable factfinder to find in his favor, defendants' motion for summary judgment is granted on plaintiff's federal ADEA claims.

**1. *Prima Facie Case***

In order to plead a prima facie case, plaintiff must show (1) membership in the protected class of persons over age 40, *see* 29 U.S.C. § 631(a); (2) qualification for the position; (3) an adverse employment action; and (4) that the "adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination." *Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir.2001). The evidentiary burden on plaintiff in establishing a prima facie case is "minimal". *Byrnie,* 243 F.3d at 101; *see also Chambers v. TRM Copy Ctrs. Corp.,*

43 F.3d 29, 37 (2d Cir.1994) (describing burden of establishing a prima facie case as "de minimis ").

■ With respect to plaintiff's age discrimination claim, there is no dispute that plaintiff has established the first three elements of a prima facie case.[8] However, defendants argue that plaintiff has failed to show that the loss of his job duties and the ultimate termination of his benefits under the contract arose under circumstances giving rise to an inference of age discrimination, and thus has failed to meet the fourth element for a prima facie claim. Plaintiff, on the other hand, argues that he has met his burden of establishing a prima facie case by showing that his job responsibilities were redistributed to employees outside of the protected class and substantially younger, namely Knothe's vice president, Zoccoli, and account manager Jeffrey Lieb, both of whom are in their thirties. In light of the minimal burden required to establish a prima facie case, we find that the redistribution of Jetter's job responsibilities to significantly younger employees creates an inference of discrimination on the basis of age. *Tarshis v. Riese Organization*, 211 F.3d 30, 38–39 (2d Cir.2000) (stating that a difference of eight years between plaintiff and his replacement "is not insignificant" and holding that fourth element of prima facie case is met).

### 2. *Legitimate, Non–Discriminatory Reason*

Given that plaintiff has successfully established a prima facie case of discrimination, the burden now shifts to defendants to articulate a "legitimate, non-discriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. This burden "is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 141, 120 S.Ct. 2097. Defendants have more than met their burden here, explaining that all adverse employment actions were taken as a consequence of Knothe's internal reorganization, plaintiff's unsatisfactory work performance, and ultimately of their belief that he fully repudiated his obligations under the non-compete provision of his contract.

### 3. *Discrimination Vel Non*

■ Once the showing of a non-discriminatory reason for adverse employment action is made by defendants, all presumptions disappear. We analyze the sufficiency of the evidence in this discrimination case as we would in any other case. *See Reeves*, 530 U.S. at 143, 120 S.Ct. 2097. Drawing all inferences in plaintiff's favor, we find that no reasonable jury could conclude based on this record that defendants acted with discriminatory intent. First, plaintiff was hired

---

8. Defendants apparently concede plaintiff's showing of the first two elements. With respect to the third element, defendants argue that no adverse employment action was taken against plaintiff until his benefits under the contract were terminated by the February 19 letter. The logic of this argument is that an employee who is told not to report to work but who is fully compensated under his contract has not been affected adversely. While plaintiff's option to get paid to stay at home would have a definite appeal for a good share of the working force, it still constitutes a "materially adverse change in the terms and conditions of employment". *Galabya*, 202 F.3d at 640 (noting that a less distinguished title and significantly diminished material responsibilities are materially adverse changes). Plaintiff also points out that in a sales business where customer contacts are so important, a three year hiatus from working in the industry would have made plaintiff less marketable. For these reasons, we believe plaintiff has met his burden of establishing adverse employment action on his discrimination claim both with respect to Knothe's suspension of all of plaintiff's job responsibilities as well as his subsequent termination.

at age 70 and fired at age 71 by the same persons. Second, not only has plaintiff failed to demonstrate that the non-discriminatory reasons proffered by defendants are pretextual, he has partially corroborated defendants' assertions that his job responsibilities were reassigned for non-discriminatory reasons. Jetter has also failed to refute defendants' significant evidence of his disqualification for his position, and admits to several of the named performance problems.

■ When the same actor is responsible for initiation and termination of employment, it is strong evidence that the employer did not act out of discriminatory animus. *Grady v. Affiliated Central Inc.,* 130 F.3d 553, 560 (2d Cir.1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.") It is undisputed that Bern both acted as the "point person" for Knothe during the asset sale and employment negotiations culminating in plaintiff's employment contract, and was primarily responsible for terminating plaintiff's employment. *See* Pl.'s Compendium, Bern Depo. at 54; Defs.' Ex. 11. Brian Minkoff was also involved in these decisions, and Ely Minkoff, who was semi-retired by the time plaintiff was terminated, was tangentially involved in the decision-making.

Plaintiff argues that because the asset sale of GNC to Knothe was made conditional on his employment contract, the same actor inference is inapplicable. He claims that once defendants bought GNC's assets and learned plaintiff's business, they began to ask him to reduce his responsibilities. However, plaintiff's assertion that defendants hired him solely to secure the assets of GNC is unsupported by any evidence and even if true, has nothing to do with plaintiff's age. Furthermore, plaintiff's argument is belied by the three year contracts Knothe simultaneously entered with his brothers, one of whom wished to be semi-retired and one of whom continues to work for Knothe even subsequent to the expiration of his initial three year contract. *See* Jetter Aff., Attach. Ex. C (discussing terms of employment contracts with Jetter brothers prior to asset purchase). While we recognize that the same actor inference is to be applied on a case by case basis, given that plaintiff was hired at 70 years of age and fired at 71 by the same persons, we agree with defendants that plaintiff's claim that these managers "suddenly develop[ed] an aversion to members of that class" is "suspect." *Ruane v. Continental Casualty Co.,* No. 96 Civ 7153, 1998 WL 292103, *8 (S.D.N.Y. June 3, 1998).

Defendants further assert that plaintiff has failed to put forth any evidence to support his claim of age discrimination. Defendants' documentation of Knothe's performance problems with plaintiff, such as plaintiff's mishandling of orders, conflicts with co-workers, and bad-mouthing of Knothe management, has already been described in some detail and is largely unrefuted by plaintiff's own deposition testimony. In addition, at his deposition, plaintiff could state no direct evidence of age discrimination; he testified that he was never told that he was unwanted because of his age or that he should leave because he was too old.[9] *See* Defs.' Ex. 1, Jetter Depo. at 158–162.

---

9. In contrast, in plaintiff's affidavit, he misstates the deposition testimony of Ely Minkoff, citing Minkoff as admitting to saying such things as "retirement won't be so bad." *See* Jetter Aff. ¶¶ 13, 25. Minkoff, who is the same age as plaintiff, specifically testified that he said such things in the context of discussing his *own* impending retirement and how he

Rather, plaintiff relies exclusively on the fact that Zoccoli, who was younger than plaintiff, took over his accounts, stating at his deposition that the only evidence he had of discrimination was the redistribution of his accounts. *See id.* However, plaintiff noted that the redistribution of his accounts did not occur until Knothe bought State–O–Maine. *See id.* at 158–62, 366–68. Moreover, plaintiff represented that Knothe's decision to replace him was actually motivated by the influence of former State–O–Maine employees who disliked him or were jealous of his knowledge of the industry.[10] *See id.* at 366–68.

Even putting aside the fact that plaintiff himself provided multiple non-discriminatory reasons for his own termination, re-delegation of his responsibilities to a youn- ger employee, with no further evidence, does not alone support a finding of age-based discrimination. In *Fagan v. New York State Elec. & Gas Corp.*, 186 F.3d 127 (2d Cir.1999), the Second Circuit held that a reorganization resulting in the transfer of plaintiff's job responsibilities to an older employee did not create an issue of fact for the jury. The Court specifically stated, however, that "[t]his analysis should not be read as suggesting that appellant could have defeated summary judgment merely by showing that he was replaced by these younger employees. The replacement of an older worker with a younger worker or workers does not itself prove unlawful discrimination." *Id.* at 134 (internal citations omitted). Further, Jeffrey Lieb, a 33 year old sales account executive for Knothe,

---

was looking forward to it. *See* Defs.' Compendium, Ely Minkoff Depo. at 61–62, 132–33 ("I didn't allude to [retirement] or anything like that because that's what it sounds like. I just had a very simple conversation and said, hey, I'm looking forward to it. It's not such a bad life.") In any case, even if plaintiff was asked about his retirement plans, inquiries about retirement plans "do[ ] not necessarily show animosity towards age." *Greenberg v. Union Camp*, 48 F.3d 22, 29 (1st Cir.1995). Moreover, the assertion in plaintiff's affidavit that he was urged to retire contradicts his deposition testimony:

Q: Did anyone tell you that you should leave the organization because you were too old?
A: No.
Q: Did anyone ever make fun of you because of your age?
A: No.
Q: Did you ever hear anyone making comments about your age?
A: Not that I know of.

*See* Defs.' Ex. 1, Jetter Depo. at 159–60.

10. At his deposition, plaintiff testified as follows:

Q: Tell me why [Knothe got rid of you].
A: When they took State–O–Maine there was an organizational chart made. I was still there and my division and State–O–Maine was their division. Right after that, they decided to get rid of me and the main reason was, I was told, I was told that Maria called on some of the customers that I called on, okay, and that she wanted to continue calling on those people.
Q: And that was the reason why they replaced you?
A: What's that?
Q: That was the reason why they replaced you?
A: No, like I said, I was too strong for them. I knew too much, I knew too many people and I did my business well.
Q: You were too strong for them?
A: Yes.
Q: For too strong for who?
A: For Maria and Steve as a person, a merchant, and an individual.
Q: You couldn't get along with them?
A: Evidently. Maria, I don't think we struck it off from the beginning.
Q: The reason why you got moved out—
A: Is because she was stronger with them than I was.
Q: She was stronger with—
A: With Knothe.
Q: Do you mean she had a better relationship?
A: Whatever it is, a relationship.
Q: You are using the word "strong." I want to know what you mean by that?
A: More influence.

*See* Defs.' Ex. 1, Jetter Depo. at 366–68.

also had accounts transferred away from him as a result of the reorganization. *See* Lieb Aff. at ¶ 9; Bern Aff. at ¶ 45.

For these reasons, we find that plaintiff has not produced sufficient evidence from which a reasonable juror could return a verdict in his favor. Defendant's motion for summary judgment is granted with respect to plaintiff's federal claim of age discrimination.

## C. Retaliation Claims

■ A claim of retaliatory discharge is also analyzed under the burden shifting analysis of McDonnell Douglas. In order to make out a prima facie case of retaliation under the ADEA, a plaintiff must show by a preponderance of the evidence (1) the participation in a protected activity known to the employer; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001); *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir.1997). In this case, the retaliation claims asserted in plaintiff's complaint are based on defendants' alleged actions: (1) forcing him to leave his position before the end of the year upon learning that Jetter might pursue contract and discrimination claims; (2) telling plaintiff's business contacts that he had retired to preclude plaintiff from obtaining alternative employment,[11] and (3) terminating plaintiff's employment compensation one day after receiving the February 18 letter from plaintiff's attorney. For the following reasons, defendants motion for summary judgment with respect to plaintiff's retaliation claim is granted.

11. We note that both parties fail to address this assertion, contained in plaintiff's com-

■ Plaintiff's first retaliation theory is based on defendants' undisputed demand that he clear out his office and cease to perform all job responsibilities immediately after learning of plaintiff's intent to file a lawsuit alleging claims including age discrimination. In opposition, defendants correctly argue that such conduct on the part of defendants does not constitute an adverse employment action under Second Circuit case law. It is undisputed that plaintiff had been notified in July that his presence at Knothe would no longer be required as of the end of the year, and that defendants' action simply moved plaintiff's last day of work up by a few weeks. In a similar case, the Second Circuit held that "the loss of an office and phone by an employee who has already been informed of a termination decision, and is waiting out his numbered days on the payroll searching for a new job, does not, in and of itself, amount to adverse employment action." *Wanamaker*, 108 F.3d at 466–67; *see also Connell v. Bank of Boston*, 924 F.2d 1169 (1st Cir.1991) (holding that bank's peremptory discharge of previously notified plaintiff, even if in retaliation for retention of counsel to protect rights regarding termination, did not constitute adverse employment action). In this case, plaintiff concedes that he was fully compensated until several months later, and asserts no losses resulting from the peremptory expulsion from Knothe's offices. Under the rationale asserted in *Wanamaker*, defendants' conduct in hastening plaintiff's departure from Knothe upon learning of his possible lawsuit does not constitute adverse employment action.

■ Plaintiff's second theory of retaliation is that defendants' communications to their customers that plaintiff had retired was an adverse employment action. The

plaint and raised in plaintiff's affidavit, in their briefs in connection with this motion.

sole support plaintiff offers for this assertion is found in his affidavit, in which he states that he refused defendants' request to send out a letter to his customers telling them that he was retiring, and that he later heard from a customer and a vender that Knothe personnel told them that plaintiff had retired. While it is true that a terminated employee "may have tangible *future* employment objectives, for which he must maintain a wholesome reputation," such alleged conduct by defendants does not rise to the level of blacklisting, refusing to write an employment recommendation, or otherwise damaging an employee's reputation, which have been held to constitute adverse employment action.[12] *See Wanamaker*, 108 F.3d at 466 (describing such case law); *Pantchenko v. C.B. Dolge Co., Inc.*, 581 F.2d 1052, 1055 (2d Cir.1978) (letters of recommendation); *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir.1979) (blacklisting), *rev'd on other grounds*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). Without the benefit of any legal argument from plaintiff on this point, and in light of the conclusory nature of plaintiff's assertions in connection with this claim, we find that Jetter has failed to show that Knothe's communication to customers of his retirement constitutes adverse employment action.[13]

Finally, plaintiff's third ground for his retaliation claim is the February 19 termination of his compensation and benefits following defendants' receipt of his

counsel's February 18 letter.[14] With respect to the third prong of the prima facie case, plaintiff argues that the causal nexus between his notice of legal action under the ADEA and the termination of his contractual benefits is established by the temporal proximity between notice of his lawsuit and the termination of his contractual benefits. See *Slattery*, 248 F.3d at 95 (stating, "temporal proximity can demonstrate a causal nexus"); *see also Carr v. Westlb Admin., Inc.*, 171 F.Supp.2d 302, 309 (S.D.N.Y.2001) (explaining that a causal connection may be established indirectly by showing that the protected activity was followed closely by discriminatory treatment). In this case, only two months expired between defendants' first notice of plaintiff's age discrimination claim in December and the February termination of his contractual benefits. In addition, the final termination of plaintiff's contractual benefits occurred one day after defendants received Post's letter reiterating this December discussion of plaintiff's potential age discrimination claims. Given the temporal proximity of plaintiff's assertion of legal rights to defendants' termination of his contractual benefits, we find that plaintiff has met the de minimus standard for establishing a prima facie case of retaliation.

However, Jetter cannot rebut defendants' legitimate non-discriminatory reason for taking action against him, nor

---

12. We note that plaintiff's claim that Knothe employees notified his customers that he had retired does not necessarily even connote that he had retired from the industry. "To retire" may mean both "to conclude one's working or professional career" or "to withdraw from one's position or occupation." Merriam–Webster's Collegiate Dictionary 1000 (10th ed.1998).

13. Surely plaintiff would not have preferred that defendants share with his former customers that he had been asked to leave for poor job performance, an alternative which could actually have a damaging effect on his reputation in the industry.

14. Defendants first learned of plaintiff's intended legal action in December, making two months (and not one day) the more relevant time period for assessing whether the termination of plaintiff's benefits was retaliatory.

does the evidence support a finding that plaintiff's benefits were actually terminated as an act of retaliation. Defendants have explained that despite their expressed willingness to compromise with plaintiff on his contractual obligation not to compete in order to allow him to continue to work, including possibly modifying plaintiff's contract, Jetter notified them on February 18 that he no longer considered himself bound by his contractual obligation not to compete. Defendants proffer this reason for the immediate termination of plaintiff's benefits under the contract. With defendants having provided a non-discriminatory explanation for their actions, we are left only with the question of whether plaintiff has offered sufficient evidence of retaliation to survive under the summary judgment standard.

We find that plaintiff has provided no evidence other than proximity in time to prove that defendants' action was taken in retaliation. Placed in the context of plaintiff's firing, such evidence alone would not allow a reasonable factfinder to conclude that plaintiff was retaliated against. *Slattery,* 248 F.3d at 95 ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). The sequence of events in this case suggests strongly that plaintiff's contractual benefits were terminated because of his stated intent not to abide by the non-compete clause of his contract. Defendants first notified plaintiff in July of 1998 that his duties were suspended as of the end of the year. Then, defendants learned that plaintiff was considering filing an age discrimination claim

(as well as other claims) in December of 1998. Though defendants at that time moved forward plaintiff's last day of work, his compensation and benefits were not terminated until plaintiff's attorney notified defendants on February 18, several months later, that plaintiff no longer considered himself bound by the restrictive covenant found in his employment contract.[15] *See* Jetter Aff., Attach. Ex. I.

In light of this sequence of events and plaintiff's inability to offer any other evidence of retaliation, we find that plaintiff has failed to put forth sufficient evidence for a reasonable factfinder to conclude that defendants' reason for terminating plaintiff was pretextual or that plaintiff was retaliated against for asserting his legal rights under the ADEA. Accordingly, defendants' motion for summary judgment on Jetter's federal retaliation claims is granted.

### CONCLUSION

Having granted defendants' summary judgment motion with respect to plaintiff's federal age discrimination and retaliation claims, we decline to exercise jurisdiction over plaintiff's remaining state law claims pursuant to 28 U.S.C. § 1367. Accordingly, defendants' motion for summary judgment with respect to all other claims and plaintiff's cross-motion for summary judgment on his breach of contract claim are denied without prejudice to their renewal in a proper forum. The Clerk of Court is respectfully directed to close this case.

**IT IS SO ORDERED.**

---

**15.** In fact, the letter from plaintiff's attorney "confirms" the details of his December conversation in which he notified defendants' counsel of plaintiff's potential age discrimination suit. The only new piece of information contained in the February 18 letter was the notice that plaintiff considered defendants' conduct to constitute a material breach of his employment contract, relieving him of his obligation to abide by its restrictive covenant.